UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/21/2024
```

--------------------------------------------------------------------X
                               :

SILVIA DIAZ-ROA,                       :

                Plaintiff,      :

                              :         24-cv-2105 (LJL)

         -v-                 :      OPINION AND ORDER

HERMES LAW, P.C.; SYZYGY LEGAL TECH, INC.   :
d/b/a CLAIMDECK; DWAYNE HERMES; and    :
ANDREA HERMES,               :

                              :

                Defendants.    :

                              :

--------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants Hermes Law, P.C. ("Hermes Law"), Syzygy Legal Tech, Inc. d/b/a ClaimDeck ("ClaimDeck"), Dwayne Hermes, and Andrea Hermes (collectively, "Defendants") move for an order (a) referring Plaintiff Silvia Diaz-Roa's ("Plaintiff") claims to arbitration and staying the instant matter for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, or, in the alternative, staying Plaintiff's sexual harassment claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") pending completion of arbitration of all other claims against Defendants; (b) dismissing the amended complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2); (c) dismissing the amended complaint for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3); (d) transferring the instant case to the Northern District of Texas pursuant to 28 U.S.C. §§ 1404(a), 1406(a) and the first-filed doctrine; (e) dismissing the amended complaint for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6); and/or (g) granting movants

costs, fees and such other and further relief as is just and proper.  Dkt. No. 34.  Defendants also move for an order staying discovery pursuant to Federal Rule of Civil Procedure 26(c).  *Id.*

For the following reasons, Defendants' motions to stay the case and compel arbitration and to transfer the case are denied.  Defendants' motion to dismiss the complaint is granted in part and denied in part.

## BACKGROUND

### A.    The Amended Complaint

The Court assumes the truth of the well-pleaded allegations of the amended complaint.  *See* Dkt. No. 30.

Hermes Law is a law firm incorporated in the State of Texas with its principal place of business also located in Texas.  *Id.* ¶ 12.  ClaimDeck is a computerized litigation management system incorporated in February 2020 in Delaware with its principal place of business in Texas. *Id.* ¶¶ 13, 23–24.  Plaintiff, who is currently domiciled in New York, New York, was employed by Hermes Law beginning on February 20, 2017, in the capacities of intern, Project Manager, Senior Project Manager, Director of Innovation, and ClaimDeck Head of Product and Chief Operating Officer.  *Id.* ¶¶ 1, 11, 17, 19–20, 52.  From approximately August 2018 through the summer of 2021, Plaintiff worked part-time for Hermes Law and ClaimDeck while she was attending graduate school at Yale University in Connecticut.  *Id.* ¶ 21.  Plaintiff returned to full-time work for Hermes Law and ClaimDeck in May 2021, after graduating from Yale University with dual master's degrees in business administration and public health.  *Id.* ¶ 22.  She worked remotely and was supervised at Hermes Law and ClaimDeck by Mr. Hermes, who is an individual domiciled in Texas.  *Id.* ¶¶ 14, 45, 48.  Mr. Hermes controls both ClaimDeck and Hermes Law.  *Id.* ¶ 27.

In December 2020, Defendants awarded Plaintiff equity compensation in the form of options to purchase 58,825 shares of ClaimDeck stock which amounted to approximately 10% of

the company's shares.  *Id.* ¶ 43; Dkt. No. 36-3 ("Nonqualified Stock Option Grant Agreement" or

"Option Agreement").[1]  The options were not immediately exercisable and instead vested over

approximately three years, at which point they would become earned.  Dkt. No. 30 ¶ 43.  By

August 2023, Plaintiff's stock options had fully vested and were worth more than $1 million.  *Id.*

¶ 63.  In December 2023, Plaintiff participated in a call with ClaimDeck accountants, an attorney,

and Mr. Hermes, during which she stated her intention to purchase her stock options.  *Id.* ¶ 64.

After that, Plaintiff repeatedly requested additional calls with ClaimDeck accountants or the law

firm to no avail.  *Id.* ¶ 65.  On January 23, 2024, Plaintiff wrote to Mr. Hermes that she wanted to

"purchase [her] options."  *Id.* ¶ 66.  Seventeen days later, Defendants fired Plaintiff without

warning and stated that the termination was for cause.  *Id.* ¶ 67.  Plaintiff had received positive

performance reviews and professional feedback from Mr. Hermes and others as late as October

2023.  *Id.* ¶¶ 58–62.

Plaintiff also alleges that she was subjected to sexual harassment while working at Hermes

Law and ClaimBridge.  Mr. Hermes and Ms. Hermes "regularly encouraged [Plaintiff] to flirt to

attract potential clients or use her appearance to attract business."  *Id.* ¶¶ 69, 71.  On other

occasions, she was encouraged to become romantically involved with certain individuals in the

industry to benefit her employers.  *Id.* ¶ 71.  Mr. Hermes repeatedly commented on Plaintiff's

appearance by "directing her to 'fix' her makeup and accusing her of looking 'tired' in front of

other ClaimDeck and Hermes Law employees."  *Id.* ¶ 72.  At a business dinner in or about

November 2023, Mr. Hermes compared Plaintiff—the only woman at the dinner—to a piece of

---

[1] Although Plaintiff did not attach the Option Agreement to her complaint, the court may
nevertheless consider the Option Agreement as integral to the complaint as Plaintiff's complaint
"relies heavily upon its terms and effect."  *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir.
2008); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

steak. *Id.* ¶ 76. Mr. Hermes did not "fixate on the appearance of male employees" and once remarked at a team retreat that two female employees looked like "a lesbian couple." *Id.* ¶¶ 73–74. In or around 2017, Mr. Hermes "jumped onto a scooter that [Plaintiff] was about to ride, sliding behind her in a compromising position" while a colleague took pictures. *Id.* ¶ 75.

Plaintiff brings claims for sexual harassment under the NYCHRL and NYSHRL, *id.* ¶¶ 77–86, breach of contract under Delaware law, *id.* ¶¶ 87–90, "deprivation of earned compensation" under section 193 of the New York Labor Law ("NYLL"), *id.* ¶¶ 91–95, tortious interference with contract under Delaware law, *id.* ¶¶ 96–105, and conversion under Delaware law, *id.* ¶¶ 106–109.

### B.    The Arbitration Agreement and Proceeding

On February 2, 2018, Plaintiff signed a mutual arbitration agreement which was attached as an addendum to the Hermes Law employee handbook. Dkt. No. 36-2 at 43 ("Arbitration Agreement").[2] The Arbitration Agreement states that "[Hermes Law] and [Plaintiff] mutually consent to the ultimate resolution by arbitration of all claims or controversies ('claims'), whether or not arising out of [Plaintiff's] employment or its termination, that [Hermes Law] may have against [Plaintiff] or that [Plaintiff may have against [Hermes Law], its employees or agents." *Id.* The Arbitration Agreement covers all claims except those for unemployment compensation benefits and certain claims relating to disclosure of trade secrets or confidential information. *Id.* It states that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement." *Id.* at 44.

On May 13, 2024, Hermes Law and ClaimDeck initiated arbitration proceedings against Plaintiff with the American Arbitration Association ("AAA").

---

[2] Citations to this document refer to the pagination denoted in the ECF heading.

C.    **The Texas Action**

On March 14, 2024, Hermes Law and ClaimDeck filed a declaratory judgment action in the United States District Court for the Northern District of Texas, seeking a declaratory judgment that, *inter alia*, Plaintiff was terminated for cause and that her stock options terminated as well. *Hermes Law, P.C., et al. v. Silvia Diaz Roa*, 24-cv-00624-K (the "Texas Action"); Dkt. No. 36–4.

On April 8, 2024, Plaintiff moved to dismiss the Texas Action on the basis that it is an "improper anticipatory lawsuit." Dkt. No. 40 at 4. On May 13, 2024, Hermes Law and ClaimDeck moved to compel arbitration in the Texas Action. Dkt. No. 36 ¶ 82. On August 8, 2024, Judge Ed Kinkeade stayed the case pending this Court's ruling on the personal jurisdiction questions raised in Defendants' omnibus motion. Dkt. No. 48-1 ("Because the New York Court's ruling on the issue of personal jurisdiction may be relevant to this Court's resolution of Ms. Diaz-Roa's pending motion to dismiss, the Court STAYS this case pending the New York Court's ruling.").

## PROCEDURAL HISTORY

Plaintiff filed this suit on March 20, 2024. Dkt. No. 1. Defendants filed an omnibus motion to compel arbitration, dismiss the case, and/or transfer the case on June 3, 2024. Dkt. No. 25. Plaintiff filed an amended complaint on June 14, 2024, Dkt. No. 30, and the Court accordingly denied Defendants' omnibus motion as moot, Dkt. No. 32.

Defendants filed the instant motion to compel arbitration, dismiss the case, and/or transfer the case on July 17, 2024, along with two supporting declarations and a memorandum of law. Dkt. Nos. 34–40. Plaintiff filed a memorandum of law and a declaration in opposition to the motion on August 7, 2024. Dkt. Nos. 39–40. On August 21, 2024, Defendant filed a reply memorandum of law and two additional declarations in further support of the motion. Dkt. Nos. 46–48.

Plaintiff filed a motion to stay arbitration on August 8, 2024, along with a supporting memorandum of law and declaration. Dkt. Nos. 41–43. Defendant filed a memorandum of law

and declaration in opposition to the motion on September 5, 2024.  On September 19, 2024, Plaintiff filed a reply memorandum of law in further support of the motion.

On November 1, 2024, the Court stayed the arbitration pending further order of the Court. Dkt. No. 56 at 44.  The Court also stayed discovery with limited exceptions.  *Id.*

## LEGAL STANDARDS

### I.    Rule 12(b)(1) and the FAA

A court properly dismisses a claim for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A motion to dismiss for lack of subject matter jurisdiction may 'raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence.'" *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 296 (E.D.N.Y. 2012) (quoting *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996)).

Where the defendant challenges the legal sufficiency of a complaint's allegations, the court must treat all factual allegations as true and draw reasonable inferences in favor of the complaining party.  *See Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001).  However, where the jurisdictional challenge is fact-based, the defendant may "proffer[ ] evidence beyond the [p]leading," and the plaintiff "will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)).  In the case of a fact-based jurisdictional challenge, "no presumptive

truthfulness attaches to the complaint's jurisdictional allegations, and the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts." *Zim Am. Integrated Shipping Servs. Co., LLC v. Sportswear Grp., LLC*, 550 F. Supp. 3d 57, 62 (S.D.N.Y. 2021) (citation omitted).

"The FAA covers arbitration provisions that are contained in employment contracts and arbitration agreements." *Sinnett v. Friendly Ice Cream Corp.*, 319 F. Supp. 2d 439, 443 (S.D.N.Y. 2004) (citing *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)). Section 2 of the FAA provides that written arbitration agreements "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 of the FAA provides for a stay of legal proceedings if the issue is arbitrable under a valid and enforceable arbitration agreement. 9 U.S.C. § 3. In determining arbitrability, courts apply the summary judgment standard. *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

## II.    Rule 12(b)(2)

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d

194, 197 (2d Cir. 1990)).  "Where, as here, jurisdictional discovery has not been conducted, the

plaintiff need only make a prima facie showing by his pleadings and affidavits that jurisdiction is

proper." *Kreit v. Byblos Bank S.A.L.*, 2023 WL 6977448, at \*3 (S.D.N.Y. Oct. 22, 2023).

### III.    Rule 12(b)(3)

Under 28 U.S.C. § 1406(a), a district court shall dismiss (or, in some circumstances,

transfer) "a case laying venue in the wrong division or district." 28 U.S.C. § 1406(a).  "Rule

12(b)(3) provides the mechanism by which a party can ask a court to do so." *Geffner v. Quanta

Servs., Inc.*, 2018 WL 6807388, at \*2 (S.D.N.Y. Dec. 27, 2018).  "[O]n a motion to dismiss for

improper venue pursuant to Rule 12(b)(3), 'the burden of proof lies with the plaintiff to show that

venue is proper.'" *Spiciarich v. Mexican Radio Corp.*, 2015 WL 4191532, at \*2 (S.D.N.Y. July

10, 2015) (quoting *Cartier v. Micha, Inc.*, 2007 WL 1187188, at \*2 (S.D.N.Y. Apr. 20, 2007)).

Upon a finding of improper venue, a court "shall dismiss, or if it be in the interest of justice,

transfer such case to any district or division in which it could have been brought."  28 U.S.C.

§ 1406(a).

"A court applies the same standard of review in Rule 12(b)(3) dismissals as Rule 12(b)(2)

dismissals for lack of jurisdiction." *Fedele v. Harris*, 18 F. Supp. 3d 309, 316 (E.D.N.Y. 2014).

"The court must draw all reasonable inferences and resolve all factual conflicts in favor of the

plaintiff." *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 555 (S.D.N.Y. 2004)

(quoting *E.P.A. ex rel. McKeown v. Port Auth.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)).  "[I]n

deciding a motion to dismiss for improper venue, the 'court may examine facts outside the

complaint to determine whether venue is proper.'" *Id.* (quoting *McKeown*, 162 F. Supp. 2d at

183).

**IV.     Rule 12(b)(6)**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. A complaint therefore must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In sum, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

Generally, when adjudicating a 12(b)(6) motion, a court will "not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

**DISCUSSION**

## I.    JURISDICTION

"To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, the Court must engage in a two-step analysis." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).[3]  First, under the Federal Rules of Civil Procedure, the Court applies the forum state's long-arm statute.  *See Chloe*, 616 F.3d ats 163; *see also* Fed. R. Civ. P. 4(e)(1), 4(h)(1)(A).  "If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution."  *Chloe*, 616 F.3d at 164.  "Due process considerations require that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013).  Plaintiff invokes two provisions of New York's long-arm statute and asserts that personal jurisdiction over all Defendants exists pursuant to N.Y. C.P.L.R. § 302(a)(1) and N.Y. C.P.L.R. § 302(a)(3).  Dkt. No. 40 at 21–24.  The Court discusses each in turn.

### A.    N.Y. C.P.L.R. § 302(a)(1)

Section 302(a)(1) states that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."  *See Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020), *adhered to in part on reconsideration*, 2020 WL 5350541 (S.D.N.Y. Sept. 4, 2020).  To establish personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1),

---

[3] An exception to this general rule exists where the federal statute provides for national service of process.  *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997).  That exception is not implicated here.

"Plaintiff must allege that (1) Defendant has 'transacted business' in New York, and (2) the claim asserted arises from that business activity."  *Guglielmo v. JEGS Automotive, Inc.*, 2021 WL 1026168, at *3 (S.D.N.Y. 2021) (quoting *Eades v. Kennedy PC Law Office*s, 799 F.3d 161, 168 (2d Cir. 2015)).

### 1.    Transacting Business

Defendants argue that none of them transacted business in New York, as "ClaimDeck did not have any contractual relationship or arrangement with any New York companies" and "Hermes Law has never handled cases in New York."  Dkt. No. 37 at 17.

Under the "transacting business" prong of the inquiry, a defendant that is not domiciled in New York need not be physically present in the state to "transact business," "so long as the defendant has engaged in 'purposeful activity,' for example, 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *Spin Master Ltd.*, 463 F. Supp. 3d at 362 (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246–47 (2d Cir. 2007)).  Section 302(a)(1) "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 40 (N.Y. 1988).

Plaintiff alleges that in or around May 2021, she moved to New York City to work full-time for Hermes Law and Claim Deck with Mr. Hermes as her direct supervisor.  Dkt. No. 30 ¶¶ 44–45.  According to Plaintiff, "Defendants were fully aware of her location and approved her remote work."  *Id.* ¶ 48.[4]  While working remotely in New York, Plaintiff was assigned work and

---

[4] Although Defendants contend that Plaintiff never submitted a W-4 reflecting a New York

directed reports to do work, "utilized equipment provided to her by Hermes Law and ClaimDeck," and "participated in ClaimDeck meetings practically daily." Dkt. No. 30 ¶¶ 46–47. At the behest of ClaimDeck, she met with several ClaimDeck partners, clients, and potential clients, as well as a ClaimDeck advisor in New York—occasionally also accompanied by Mr. Hermes. *Id.* ¶¶ 33, 35–36, 42.[5] Plaintiff also attended industry events in New York, including charitable events, at the behest of ClaimDeck, Mr. Hermes, and Hermes Law. Dkt. No. 30 ¶¶ 37–40.

The parties dispute whether the work Plaintiff performed in New York can be construed as business transacted by Defendants. Defendants argue that "Plaintiff's own alleged contacts or meetings in New York are irrelevant to the analysis of personal jurisdiction." Dkt. No. 37 at 18; *see also* Dkt. No. 46 at 8–11. Plaintiff argues that her allegations that "[f]or nearly three years, [Plaintiff] worked from New York on behalf of Hermes Law, ClaimDeck, and their controlling owners . . . from where she utilized Defendants' equipment to work, including managing employees and participating in business meetings . . . are more than sufficient to show that Defendants transacted business in New York." Dkt. No. 40 at 23.

---

address, and applied for a general residence homestead exemption for a house in Texas in 2023, Dkt. Nos. 37 at 4; Dkt. No. 36 ¶¶ 72, 75–77, Defendants do not dispute that they were aware of Plaintiff's location or that they approved her remote work in New York. Indeed, Mr. Hermes avers that during the week of April 23, 2023, he traveled to New York "to do an employee check-in with Plaintiff." Dkt. No. 36 ¶ 40. Plaintiff avers that she owns a rental property in Texas but that she had no knowledge when she filed this complaint that a homestead exemption was filed for that house and that the form seeking the exemption does not bear her handwriting. Dkt. No. 38 ¶¶ 15–19.

[5] Mr. Hermes' declaration states that he did not have meetings with certain of the companies Plaintiff named on the dates she alleged but that he might have spoken to or greeted representatives of some of the companies at a conference he was attending in New York during that time. Dkt. No. 36 ¶¶ 35–39. His declaration states that certain other meetings with potential clients alleged in the complaint did occur but did not result in the purchase or contract of ClaimDeck products. *Id.* ¶¶ 41–42, 45–46, 48.

The New York Court of Appeals has held that the usual rule is that "an agent may not rely upon his or her own New York contacts on behalf of a principal to establish long-arm jurisdiction" over the principal, but where a defendant solicited the plaintiff's work in New York and engaged in continued professional communications with the plaintiff in New York, it may be found to have transacted business. *Fischbarg v. Doucet*, 880 N.E.2d 22, 28 (N.Y. 2007) (holding that "[c]ontrary to defendants' argument, this is not a case in which plaintiff is attempting to establish long-arm jurisdiction on the basis of his unilateral conduct in New York" because "[a] continuing relationship was also contemplated and created here, as evidenced by defendants' retention letter and the many communications cited in plaintiff's affidavit and time records, even though defendants never entered New York").  Courts in this Circuit have accordingly found that where a plaintiff's decision to work remotely from New York "was not unilateral," because the defendants were aware the plaintiff was located in New York and nonetheless continued to employ and communicate with the plaintiff in New York, such defendants have transacted business in the state for the purpose of the long-arm statute. *Williams v. Preeminent Protective Servs., Inc.*, 81 F. Supp. 3d 265, 271 (E.D.N.Y. 2015); *see, e.g.*, *id.* ("Defendants hired [plaintiff] knowing that she would live and work in Brooklyn, and 'continued their communications with plaintiff here' for a sustained period of time, thereby engaging in the kind of 'independent activities' in the state that render long-arm jurisdiction appropriate." (quoting *Fischbarg*, 880 N.E.2d at 28) (citation omitted)); *Kumar v. Opera Sols. OPCO, LLC*, 2021 WL 4442832, at *8 (S.D.N.Y. Sept. 28, 2021) (holding defendants transacted business in New York where they "knew that [plaintiff] worked from New York, permitted her to do so, and regularly communicated with her via email, phone, and virtual meeting for a sustained period of time." (punctuation omitted)) (collecting cases); *Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 418 (E.D.N.Y. 2017) ("Defendants argue that the only nexus to

New York in this case is that the Plaintiff happens to reside here, but that is not the case" because defendant "in essence hired a group of New York residents to develop the content for his company" and thus "purposefully avail[ed] himself of the privilege of conducting activities within New York thus invoking the benefits and protections of its laws." (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986))); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 358–59 (S.D.N.Y. 2007) (holding defendants transacted business in New York where "Plaintiff worked from her home in New York City[] [and defendants] communicated with her there in connection with that employment" including communicating regarding plaintiff's work assignments "via telephone, email, and fax to her home office in New York"); *cf. Doe v. McAdam Fin. Grp. LLC*, 2022 WL 3579700, at *6 (S.D.N.Y. Aug. 3, 2022) (finding no personal jurisdiction where "[t]here is no allegation in the complaint or evidence in the parties' affidavits that [defendant] hired [plaintiff] knowing that she would live and work in New York, and continued its communications with plaintiff here for a sustained period of time, thereby engaging in the kind of independent activities in the state that render long-arm jurisdiction appropriate" (citation omitted)), *report and recommendation adopted*, 2022 WL 3578569 (S.D.N.Y. Aug. 19, 2022).

Here too, Hermes Law, ClaimDeck, and Mr. Hermes were aware that Plaintiff was working in New York and nonetheless approved of her remote work, supervised her work, sent her equipment to facilitate her work, directed her to attend events in New York, and communicated with her at meetings and events in New York.  Dkt. No. 30 ¶¶ 35, 38–42, 45–49; Dkt. No. 37 ¶ 40. Those "[d]efendants' sustained business relationship with the plaintiff [in New York] is sufficient for long-arm jurisdiction to attach." *Jewell*, 254 F. Supp. 3d at 418–19.

However, Plaintiff does not allege or aver that she had any sustained business relationship with Ms. Hermes once Plaintiff became a New York resident. Ms. Hermes avers that she retired from the workforce in January 2021, prior to Plaintiff's relocation to New York, Dkt. No. 35 ¶¶ 12, 26; Dkt. No. 30 ¶ 44, and Plaintiff does not dispute that or identify any conduct Ms. Hermes engaged in since that time that would constitute business transacted in New York.

Plaintiff argues that, due to the agency relationship between a corporation and its officers, "if a corporation has sufficient in-state contacts to fall subject to personal jurisdiction, then a corporate officer who has played a part in the corporate activities that gave rise to the action is likewise subject to jurisdiction, to the extent that due process permits." Dkt. No. 40 at 23 (quoting *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 261 (S.D.N.Y. 2019)). To establish such jurisdiction, "Plaintiff need not establish a formal agency relationship" between Ms. Hermes and ClaimDeck or Hermes Law, but "need only convince the court that [the corporate defendants] engaged in purposeful activities in this State . . . for the benefit of and with the knowledge and consent of [the individual defendants] and that they exercised some control over [the corporate defendants] in the matter." *Kreutter*, 522 N.E.2d at 44. However, this principle does not permit a finding of personal jurisdiction over Ms. Hermes because Plaintiff fails to allege that ClaimDeck and Hermes Law maintained Plaintiff's employment relationship in New York with the knowledge, consent, and control of Ms. Hermes.

### 2. Arising out of New York Activity

The second prong of section 302(a)(1) requires that Plaintiff's causes of action "arise from" Defendants' transactions in New York. *See Dicks v. Cooks Junction, Inc.*, 2023 WL 2775830, at *4 (S.D.N.Y. Apr. 4, 2023). Under the second prong, "[a] suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship,

between the claim asserted and the actions that occurred in New York." *Best Van Lines*, 490 F.3d at 246 (citation omitted).

Plaintiff's claims for sexual harassment and unpaid wages, as well as her contract-related claims, arise out of her employment relationship with Hermes Law, ClaimBridge, and Mr. Hermes. *See D'Anzieri v. Harrison Glob. LLC*, 2022 WL 17404254, at *4, *7 (S.D.N.Y. Dec. 2, 2022); *Williams*, 81 F. Supp. 3d at 272 ("It is clear from the face of the Complaint that there is a 'substantial relationship' between the work plaintiff alleges she undertook for defendants and her claims in this suit, which arise out of her termination by defendants."). Defendants acknowledge as much. *See* Dkt. No. 37 at 8 (Defendants state that "[e]very claim in this case arises out of Plaintiff's employment with Hermes Law and her alleged work at ClaimDeck, including her claims regarding her options to purchase ClaimDeck's stocks."). Because Plaintiff's claims arise out the employment relationship Defendants had with Plaintiff in New York, this element is satisfied.

### 3.    Due Process Under the United States Constitution

Due process necessitates "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). Due process "is satisfied without further inquiry by state long-arm statutes, like Section 302, that permit the exercise of jurisdiction in a narrower range of circumstances than the Due Process Clause." *WowWee Grp. Ltd. v. Meirly*, 2019 WL 1375470, at *5 (S.D.N.Y. Mar. 27, 2019) (Nathan, J.); *see Mattel, Inc. v. www.fisher-price.online*, 2022 WL2801022, at *4 (S.D.N.Y. 2022) ("Because Section 302(a)(1) permits the exercise of personal jurisdiction in a narrower range of circumstances than the Due Process Clause, the Court's conclusion that it may exercise personal jurisdiction under Section 302(a)(1) over Defendant necessarily carries with it the further conclusion that the exercise of such jurisdiction comports with constitutional due process.").

16

Personal jurisdiction over Hermes Law, ClaimBridge, and Mr. Hermes is therefore consistent with the Due Process Clause of the United States Constitution for the reasons already discussed.

### B.    N.Y. C.P.L.R. § 302(a)(3)

Plaintiff also argues that personal jurisdiction is proper pursuant to N.Y. C.P.L.R. § 302(a)(3). Dkt. No. 40 at 23–24. Because the Court finds specific personal jurisdiction over Hermes Law, ClaimBridge, and Mr. Hermes pursuant to N.Y. C.P.L.R. § 302(a)(1), the Court analyzes Plaintiff's argument under N.Y. C.P.L.R. § 302(a)(3) only with respect to Ms. Hermes.

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii), Plaintiff must allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 162 (N.Y. 2011); (citing N.Y. C.P.L.R. § 302(a)(3)(ii)); *see also* N.Y. C.P.L.R. § 302(a)(3)(i) (replacing the fourth and fifth elements with "[defendant] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state").

Here, Plaintiff's claim for personal jurisdiction fails on the first element: Plaintiff has not alleged that Ms. Hermes undertook any conduct constituting a tortious act. *See Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 416 (S.D.N.Y. 2021) ("Plaintiff has not alleged that the conduct . . . supporting her claims of discrimination and aiding and abetting discrimination constitutes a tortious act."); *Ehrenfeld v. Bin Mahfouz*, 2006 WL 1096816, at *4 (S.D.N.Y. Apr. 26, 2006) ("Though [plaintiff] contends that [her claim] is 'akin to malicious prosecution or prima facie tort,

17

that is, the intentional infliction of harm by superficially lawful means,' she does not allege the commission of either tort . . . nor does she assert that the elements of either tort have been satisfied.") (subsequent history omitted).  Plaintiff alleges that her termination by Defendants as an undifferentiated group constitutes tortious interference with contract and conversion under Delaware Law, but does not specify any role Ms. Hermes played in the termination or respond to Ms. Hermes' averments that she had retired by the time of Plaintiff's termination.  Dkt. No. 30 ¶¶ 67, 106–109; Dkt. No. 35 ¶¶ 12, 26.  Similarly, Plaintiff alleges that Mr. and Ms. Hermes "regularly encouraged [Plaintiff] to flirt to attract potential clients or use her appearance to attract business," Dkt. No. 30 ¶¶ 69– 71, but does not identify any comment attributable to Ms. Hermes or explain how Ms. Hermes' conduct constitutes a tort.  *See Gilbert*, 513 F. Supp. 3d at 416 (finding no specific personal jurisdiction where plaintiff argues that defendant's actions constitute sexual harassment under the NYSHRL and NYCHRL but "has not explained how these actions make out the elements of a tort under New York or other law").  Because the Court does not have personal jurisdiction over Ms. Hermes, the claims against her are dismissed without prejudice.

In sum, Defendants' motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) is granted as to Ms. Hermes and denied as to all other Defendants.

## II.    ARBITRATION

Defendants seek an order, pursuant to Federal Rule of Civil Procedure  12(b)(1) and section 3 of the FAA, referring all of Plaintiff's claims to arbitration and staying the instant matter or at least staying Plaintiff's NYSHRL and NYCHRL claims pending completion of arbitration of the remaining claims against Defendants.  Dkt. No. 34.

The "FAA compels judicial enforcement of . . . written arbitration agreements."  *Cir. City Stores*, 532 U.S. at 111.  Section 2 of the FAA, provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2; *see Credit Suisse AG v. Graham*, 533 F. Supp. 3d 122, 127–28 (S.D.N.Y. 2021). At its core, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). "This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986).

Arbitration disputes may raise overlapping questions regarding (1) "whether a court or an arbitrator is to decide the question of arbitrability," (2) whether the dispute is arbitrable, and (3) whether the complainant's claims are meritorious. *Pacelli v. Augustus Intel., Inc.*, 459 F. Supp. 3d 597, 605 (S.D.N.Y. 2020) (quoting *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013)); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 326 (1995). Each must be answered before the subsequent questions may be addressed.

The parties do not dispute that Plaintiff signed the arbitration agreement. Dkt. No. 36-2 at 45; Dkt. No. 40 at 7. However, Plaintiff argues that: (1) Defendants waived the right to arbitration through their conduct in the Texas Action, and (2) the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. § 402, renders the arbitration agreement invalid and unenforceable with respect to this case.

## A. Waiver

Plaintiff argues that Defendants waived their right to arbitration by filing and pursuing the Texas Action. Dkt. No. 40 at 5–9. Defendants, in turn, argue that waiver is a question of arbitrability that should be reserved for the arbitrator to decide, Dkt. No. 37 at 9–10; Dkt. No. 46

at 1, and that even if the Court does decide the issue of waiver, Defendants' prior litigation conduct does not rise to the level of waiver, Dkt. No. 46 at 2–6.

The issue of arbitrability is properly before the Court. In *Howsam v. Dean Witter Reynolds, Inc.*, the United States Supreme Court distinguished "procedural questions" from expressly-delegated "questions of arbitrability" with the former reserved for arbitrators and the latter for courts to decide. 537 U.S. 79, 84 (2002). "Although one might think otherwise at first glance," whether a party has waived its right to arbitrate by litigating actively "is not a procedural question reserved for the arbitrators but instead a question of arbitrability." *Pacelli*, 459 F. Supp. 3d at 612. The Supreme Court held in *Howsam* that, as a general matter, waiver is a procedural question "presumptively not for the judge, but for an arbitrator, to decide." 537 U.S. at 84 (emphasis omitted); *Pacelli*, 459 F. Supp. 3d at 613; *see also* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2.18 TD No 4 (Mar. 2020) ("[A]uthority to determine that a precondition to arbitration was not met presumptively resides with the arbitral tribunal."). However, "[p]rior to *Howsam*, the Second Circuit had drawn a distinction between 'cases where the waiver defense was based on prior litigation by the party seeking arbitration—when the court should decide the issue of waiver—and those when the defense was based on other actions.'" *Pacelli*, 459 F. Supp. 3d at 613 (quoting *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 (2d Cir. 1995)) (citing *Bell v. Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002)). "*Howsam* did not actually reach the question of litigation-conduct waiver" and instead focused upon the latter scenario—"whether a party waived its arbitration rights by not complying with a contractual time limitation for asserting arbitration." *Apple & Eve, LLC v. Yantai N. Andre Juice Co.*, 610 F. Supp. 2d 226, 230 (E.D.N.Y. 2009) (Bianco, J.) (citation omitted). The Second Circuit's distinction between litigation-waiver and other forms of waiver has survived *Hoswam*. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 81

(2d Cir. 2017) ("Because [plaintiff's] waiver argument is based on defendants' defense of this litigation in the district court, we conclude that is a question for the district court rather than an arbitrator."); *Apple & Eve*, 610 F. Supp. 2d at 231 (collecting cases); *Pacelli*, 459 F. Supp. 3d at 613 (collecting cases). Because "waiver-by-litigation-conduct is not a procedural question presumptively for an arbitrator to decide," the question whether Defendants' conduct in the Texas Action waived their right to arbitration is properly before the Court at this time. *Pacelli*, 459 F. Supp. 3d at 614 (citation and punctuation omitted).

To determine whether a party has waived their right to arbitration, the courts ask "whether a party 'knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right.'" *Brown v. Peregrine Enterprises, Inc.*, 2023 WL 8800728, at *3 (2d Cir. Dec. 20, 2023) (summary order); *see Billie v. Coverall N. Am. Inc.*, 2023 WL 2531396, at *3 n.3 (2d Cir. Mar. 15, 2023) (summary order).[6] "For decades, the Second Circuit assessed whether a party had waived its right to arbitrate by considering '(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice.'" *Brevard v. Credit Suisse*, 2024 WL 36991, at *8 (S.D.N.Y. Jan. 3, 2024) (quoting *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010)). "Unlike in ordinary cases [] concerning the waiver of

---

[6] Defendants argue in light of the choice-of-law provision in the arbitration agreement, that Texas law, rather than New York law, "governs the validity, revocability, and enforceability of the Arbitration Agreement at issue." Dkt. No. 37 at 7; Dkt. No. 46 at 2 n.2. "Choice-of-law provisions, however, generally designate only the substantive law to be applied by the arbitrators and do not displace application of federal arbitration law to determine the arbitrability of claims or any defenses thereto such as waiver." *Boustead Sec., LLC v. Leaping Grp. Co.*, 656 F. Supp. 3d 447, 450 n.6 (S.D.N.Y. 2023) (citation omitted); *see also Smith v. Allstate Power Vac, Inc.*, 482 F. Supp. 3d 40, 47 (E.D.N.Y. 2020) ("In cases where the FAA is applied, the issue of waiver by litigation is typically governed by the body of federal substantive law of arbitrability."); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

contractual rights, prejudice was the *sine qua non* for waiver of the right to arbitrate." *Id.* In *Morgan v. Sundance, Inc.*, however, the Supreme Court held that nine circuits—including the Second Circuit—had improperly construed "the strong federal policy favoring arbitration" to require a showing of prejudice as an "arbitration-specific waiver rule" and rejected the arbitration-specific prejudice requirement. 596 U.S. 411, 416 (2022). Since *Morgan*, courts in this Circuit have disagreed as to whether the proper framework for assessing waiver of the right to arbitrate is the general contractual waiver test or the Second Circuit's classic three-cum-two part test omitting the prejudice requirement. *See Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 29 (E.D.N.Y. 2023), *aff'd*, 2024 WL 3643269 (E.D.N.Y. Aug. 2, 2024); *Brevard*, 2024 WL 36991, at *8 & n.5. Nonetheless, "the Second Circuit has continued to treat the amount of time elapsed and amount of litigation as highly probative indicia of waiver." *Brevard*, 2024 WL 36991, at *8 (citing *Nicosia v. Amazon.com, Inc.*, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023) (summary order)). The party opposing the motion to compel arbitration bears the burden of showing waiver. *See In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 293 (S.D.N.Y. 2021).

Defendants filed the Texas Action on March 14, 2024, and moved to compel arbitration two months later on May 13, 2024, following Plaintiff's motion to dismiss. Dkt. No. 36–4; Dkt. No. 36 ¶ 82. Courts in this District have found two-month delays "insubstantial" for the purposes of assessing the time elapsed. *See, e.g.*, *Johnson v. Ensite USA, Inc.*, 2022 WL 463381, at *5 (S.D.N.Y. Feb. 15, 2022); *DeSimone v. TIAA Bank, FSB*, 2021 WL 4198274, at *6 (S.D.N.Y. Sept. 14, 2021) (Nathan, J.); *Cornelius v. Wells Fargo Bank, N.A.*, 2020 WL 1809324, at *7 (S.D.N.Y. Apr. 8, 2020); *Benihana of Tokyo, LLC v. Benihana Inc.*, 73 F. Supp. 3d 238, 248 n.6 (S.D.N.Y. 2014). Plaintiff argues that the amount of time should instead be measured against Plaintiff's first litigation hold letter, which was sent on February 9, 2024, and would add approximately one month

of elapsed time.  Dkt. No. 40 at 9; Dkt. No. 39-1.  However, Plaintiff cites no authority for her proposition that the litigation hold letter marks the appropriate starting point.  *Cf. La. Stadium*, 626 F.3d at 159 (measuring from initial filings in state and federal court); *Krantz & Berman LLP v. Dalal*, 472 F. App'x 76, 77 (2d Cir. 2012) (summary order) (measuring from "commencement of the litigation").  Even if the Court were to backdate the litigation as Plaintiff requests, three months is not a substantial amount of time such that the Court's assessment would be materially altered.  *See Brevard*, 2024 WL 36991, at *8–9; *Trs. of N.Y. State Nurses Ass'n Pension Plan v. Hakkak*, 2023 WL 4967071, at *7 (S.D.N.Y. Aug. 3, 2023).

The amount of litigation that has transpired to date is also not significant.  Plaintiff has not answered the complaint in the Texas Action and the case has been stayed since August 8, 2024.  Dkt. No. 48-1.  Plaintiff does not point to any discovery that has yet taken place.  "Courts have repeatedly recognized that this posture weighs against finding that the defendant waived its right to arbitration."  *Boustead Sec.*, 656 F. Supp. 3d at 452 (collecting cases); *see Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) ("This Circuit has refused to find waiver in a number of cases where delay in trial proceedings was not accompanied by substantial motion practice or discovery."); *Nicosia*, 815 F. App'x at 615 (affirming motion to compel arbitration where parties had not "engaged in litigating any substantial merits questions").  Although "there is no requirement that the party against whom waiver is urged have made dispositive motions," and "a filing of pleadings, exchange of discovery, settlement conferences, and litigation of lesser issues related to the merits may be significant," *Satcom Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 340 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1324 (2d Cir. 1999), Plaintiff has not shown that such alternative forms of significant litigation have transpired.

The Second Circuit has noted that, for the purposes of waiver, it is "significant" when the party that initiated the litigation later moves to compel arbitration because "by filing its lawsuit and litigating it at length, [such a plaintiff] acted inconsistently with its contractual right to arbitration." *La. Stadium*, 626 F.3d at 161 (citation omitted); *see id.* at 160–61 ("If LSED had sufficient information to hale MLPFS into federal court, it should also have been aware that it could arbitrate its claims against MLPFS."). The Second Circuit did, however, "recognize that a plaintiff's initiation of a lawsuit does not, by itself, result in a waiver of arbitration." *Id.* at 160; *see also Pacelli*, 459 F. Supp. 3d at 617 ("Plaintiffs claim that merely by filing a lawsuit rather than initiating arbitration, Defendant has waived arbitration[] [but] [t]he law does not support that result."). The driving concern is that a plaintiff will improperly attempt to "use arbitration as a means of aborting a suit that did not proceed as planned in the District Court." *La. Stadium*, 626 F.3d at 160–61; *see id.* at 161 ("[W]e do not want parties to forum shop, taking a case to the courts and then, if things go poorly there, abandoning their suit in favor of arbitration." (quoting *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002)). Thus, the Second Circuit also found it notable that the defendant in *La. Stadium* had won "several key procedural victories" before the plaintiff moved to compel arbitration. *Id.* at 160; *see also Satcom Int'l*, 49 F. Supp. 2d at 340 (holding plaintiff waived right to arbitration where "nearly all substantive issues have already been litigated extensively" and defendant "has generally prevailed in this action to date"); *LG Elecs., Inc. v. Wi-LAN USA, Inc.*, 2015 WL 4578537, at *4 (S.D.N.Y. July 29, 2015) (finding no waiver where "[t]he parties here have not taken extensive discovery under the Federal Rules of Civil Procedure, LG has not generally prevailed in this action to date and thus would not be forced to start over in arbitration, all substantive issues have not already been litigated extensively, and Wi–LAN (the party against whom waiver is urged) did not make motions going to the merits of LG's

arguments" (citation omitted)).    Here too, there is no indication that the parties have taken extensive discovery in the Texas Action, that Plaintiff prevailed with regard to anything, or that substantive issues have been extensively litigated.

In sum, the brief tenure and nature of the Texas Action is insufficient to demonstrate that Defendants have "acted so inconsistently with [their] arbitration right as to have waived arbitration" through their litigation conduct.  *Brown*, 2023 WL 8800728, at *3.

## B.    The EFAA

In 2022, Congress amended the FAA by enacting the EFAA to "render[] arbitration agreements invalid and unenforceable, at the election of the complainant, in sexual assault and sexual harassment cases."  *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 77 (2d Cir. 2024); 9 U.S.C. § 402.  The EFAA was enacted to "restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system of arbitration that often favors the company over the individual."  H.R. Rep. No. 117-234 at 4 (2022).

In particular, Congress recognized that in the EFAA's absence, mandatory arbitration clauses often entitle companies "to choose the arbitrator who decides the case, as well as the rules of procedure and evidence that apply, and the distribution of costs of the arbitration," "protect the company by keeping the records of an arbitration secret," permit employers to retaliate against their victims "without fear of their actions becoming public through the courts," and "prevent[] victims from sharing their stories."  *Id.*  "This allows for the growth of office cultures that ignore harassment and retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers."  *Id.*  The report published by the House Judiciary Committee incorporated the findings of a study conducted by the Economic Policy Institute that "[w]hen

employees work under forced arbitration clauses, they are less likely to win in disputes with their employers, or even to bring them at all" and that "[w]orkers that do enforce their rights in the workplace receive less in damages in arbitration than would have been available in court." *Id.* at 9–10 (citing Alexander J.S. Colvin, *The Growing Use of Mandatory Arbitration*, Econ. Policy Inst., September 27, 2017, at 1–3, 5–6).

> To combat these harms, section 402(b) of the EFAA provides:
>
> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).  Section 401 of the EFAA provides definitions for the terms "sexual assault dispute" and "sexual harassment dispute."  9 U.S.C. § 401.  Sexual assault dispute is defined to mean:

> [A] dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent.

9 U.S.C. § 401(3).  Sexual harassment dispute is defined to mean:

> [A] dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law.

9 U.S.C. § 401(4).  The EFAA further provides that the validity and enforceability of an arbitration agreement to which the EFAA applies "shall be determined by a court, rather than an arbitrator." *Id.*  9 U.S.C. § 402(b).[7]

---

[7] Section 402(b) of the EFAA states in full:

> The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by

The threshold requirement that must be satisfied for the EFAA to permit a litigant to avoid enforcement of a pre-dispute arbitration agreement is that the litigant must allege "conduct constituting a sexual harassment dispute or sexual assault dispute," as defined in the statute. 9 U.S.C. § 402(a).[8]  If that threshold requirement is satisfied, a predispute arbitration agreement does not apply to the case so long as: (1) it is filed under Federal, Tribal, or State law; and (2) "relates to the sexual assault dispute or sexual harassment dispute" as defined in the statute. *Id.*

The Court applies familiar principles in interpreting the FAA as amended by the EFAA.  It begins "with the statutory text, exhausting 'all the textual and structural clues' bearing on its meaning and construing each word 'in its context and in light of the terms surrounding it.'" *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (quoting *Wis. Cent. Ltd v. United States*, 585 U.S. 274, 283 (2018)).

The statute is of expansive effect.  The language "filed under Federal, Tribal, or State law" is inclusive.  It captures, without limitation, virtually every case that could be filed in a court in the United States, save for the few cases filed exclusively under foreign or international law. Tellingly, the language does not require the case to state a claim "under Federal, Tribal, or State law."  *See Harrigan v. City of New York*, 2020 WL 2555307, at *3 (S.D.N.Y. May 20, 2020) (filing—as opposed to stating a claim—is an administrative act that "requires nothing more than

---

a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator.

9 U.S.C. § 402(b).  The Court accordingly rejects Defendants' argument that the arbitrators are to decide the arbitrability of all claims, Dkt. No. 37 at 9–10, as the Court is expressly tasked with determining arbitrability pursuant to the EFAA.

[8] In addition, the litigant may be "the named representative of a class or in a collective action alleging such conduct." *Id.*

delivery of the document to a court officer authorized to receive it." (quoting 4 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4417 (4th ed. 2020)).  For the EFAA's purposes, it is sufficient that the case invokes such law as a basis for relief.  *See Bell v. Hood*, 327 U.S. 678 (1946).

Moreover, if the EFAA is properly invoked and applies, the pre-arbitration agreement is invalid and unenforceable with respect to the entire case.  The term "case" is "familiar to the law" and "captures the legal proceeding as an undivided whole."  *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 559 (S.D.N.Y. 2023).  Congress knows how to use the narrower term "claim" when it so intends.  *See Keene Corp. v. United States*, 508 U.S. 200, 210 (1993); *see also Brownback v. King*, 592 U.S. 209, 220 (2021) (Sotomayor, J., concurring) (distinguishing the terms "action" and "claim").  Indeed, Congress used the narrower term elsewhere in the statute concerning the EFAA's effective date:  Congress provided in a statutory note that the EFAA "shall apply with respect to any dispute or claim that arises or accrues on or after March 3, 2022."  *Johnson*, 657 F. Supp. 3d at 559 (quoting Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022)).  Nonetheless, Congress selected the word "case" and not "claim" when it described the effect of the EFAA to matters to which it was applicable.  *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020) (noting that courts "generally presume[] that when Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning" (citations omitted)).  Furthermore, a requirement that the litigant split their claims, trying some in arbitration and others in court, "would be inconsistent with Congress's stated purpose in enacting the EFAA: to empower claims by sexual harassment and/or assault victims that had been inhibited

by proliferating arbitration clauses in employment agreements." *Baldwin v. TMPL Lexington LLC*, 2024 WL 3862150, at *8 (S.D.N.Y. Aug. 19, 2024). [9]

While the federal rules contemplate an expansive definition of "case," including all claims that the party has against a particular opponent falling within federal jurisdiction, 3 Moore's Federal Practice, § 13.110[1]–[3] (2024); *see also Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409 (2015) ("The Federal Rules allow a plaintiff to 'state [in one complaint] as many separate claims . . . as it has.'" (quoting Federal Rule of Civil Procedure 8(d)(3))), the concern that application of the EFAA will sweep in claims that are entirely unrelated to the sexual harassment or assault appears to be overstated. Virtually by definition, all of the claims to which the EFAA applies will arise from the relationship that the plaintiff has with his or her harasser or assaulter. *See, e.g. Baldwin*, 2024 WL 3862150, at *8 (applying the EFAA to bar arbitration of all claims because plaintiff's labor claims "clearly relate, factually and temporally, to her sexual harassment claims" given that "[t]hey all arise from [plaintiff's] employment at [defendant] between January 2022 and September 2023 and relate to her own experience and employment" (citation omitted)); *Johnson*, 657 F. Supp. 3d at 562 n.23 ("[Plaintiff's] claims against [Defendant] and its executives all arise from his employment at [Defendant] and are clearly properly joined in a common

---

[9] The Court thus disagrees with Magistrate Judge Aaron's decision in *Mera v. SA Hospital Grp., LLC*, 675 F. Supp. 3d 442, 447–48 (S.D.N.Y. 2023), that when a litigant files a case with multiple claims, the EFAA can invalidate the arbitration agreement only as to the claims related to the sexual assault or sexual harassment dispute. That interpretation would require courts to carve up every case to which the EFAA applies by reaching judgment—with respect to each claim—on whether the claim relates to the sexual harassment or sexual assault dispute. But that approach not only is antithetical to the language of the EFAA and its protective intent, *see Doe v. Second St. Corp.*, 105 Cal. App. 5th 552, 57–60 (Cal. Ct. App. 2024) (rejecting *Mera*, 675 F. Supp. 3d 442), but it would also have the court address early in a case and in a definitive manner "a question that often is not easily answered on the pleadings," *Alvarado v. Sweetgreen, Inc.*, 712 F. Supp. 3d 393, 406 (S.D.N.Y. 2024). It is not self-evident for example, that evidence that the plaintiff was the victim of persistent sexual assault or harassment would be irrelevant to the claim that such person had also been deprived of her rights to a minimum wage and overtime pay.

lawsuit."); *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 926 (N.D. Cal. 2023) (applying the EFAA to bar arbitration of all claims because plaintiff's "workplace injury and wage claims relate . . . to her own experience and employment at [defendant]—and are intertwined with her sexual harassment claims").

The more challenging interpretative question concerns the allegations that are necessary to invoke the EFAA in the first place and to determine whether the statute is applicable to the case. The EFAA renders arbitration agreements invalid and unenforceable only on the "election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute," and applies only if the case "relates to the sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a). Defendants argue that—before the court may determine that the EFAA invalidates an arbitration agreement—the court must first determine that the claimant has alleged a claim for sexual harassment or sexual assault that passes the Rule 12(b)(6) threshold set forth in *Twombly* and *Iqbal*. If the complaint does not contain a well-pleaded allegation of sexual assault or harassment, Defendants contend that the plaintiff must be required to honor the arbitration agreement and accordingly relegated to arbitration. Defendants invoke the district court decision in *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563 (S.D.N.Y. 2023), and the cases that have followed it, *see, e.g.*, *Singh v. Meetup LLC* ("*Singh I*"), 2024 WL 3904799, at *2 (S.D.N.Y. Aug. 22, 2024) (collecting cases), *reconsideration denied Singh v. Meetup LLC* ("*Singh II*"), 2024 WL 4635482 (S.D.N.Y. Oct. 31, 2024). For her part, Plaintiff argues that, for the EFAA to apply, a plaintiff need only allege conduct that constitutes sexual assault or harassment. In her view, the determination that the alleged conduct does or does not actually constitute sexual assault or harassment passing the *Twombly*/*Iqbal* screen is one that goes to the merits and not to the adjudicative capacity of the tribunal asked to render a judgment. The *Yost* court acknowledged

that "[t]he EFAA's text does not definitively decide" this interpretative question.  657 F. Supp. 3d at 585.

This Court parts from the holding of *Yost* and concludes that the view that is more faithful to Congress' language and intent is that a plaintiff need only plead nonfrivolous claims relating to sexual assault or to conduct alleged to constitute sexual harassment, with the sufficiency of those claims to be reserved for proper merits adjudication, be it a motion to dismiss, motion for judgment on the pleadings, motion for summary judgment, or trial.  The Court arrives at this interpretation based on (1) the text of the statute; (2) the statutory scheme; (3) Congress' intent in enacting the EFAA; and (4) the availability of the routine safeguards against abusive litigation tactics already provided by federal statute and by the Federal Rules of Civil Procedure.

### 1.    Statutory Text

Congress' choice of language in the EFAA was careful.  The statute on its face is directed to "the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute," and applies to a case which, among other things, "relates to the sexual assault dispute or the sexual harassment dispute."  9 U.S.C. § 402(a).  In defining the relevant terms, Congress distinguished between a "sexual assault dispute" and a "sexual harassment dispute."  A "sexual assault dispute" is defined as a dispute that "involve[es] a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law."  9 U.S.C. § 401(3).  The person seeking to invoke the EFAA thus must allege conduct that constitutes "a non-consensual sexual act or sexual contact," under at least one of the applicable statutes.  In stating what is required for a "sexual harassment dispute," by contrast, Congress did not refer to specific acts but rather to the laws that were alleged to have been violated; Congress defined the term "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."  9 U.S.C. § 401(4).

Congress' word choice must be considered intentional.  *See United States v. Naftalin*, 441 U.S. 768, 773 (1979) (rejecting an alternative statutory interpretation because "[t]he short answer is that Congress did not write the statute that way."); *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).  From a textual perspective, the statutory language does not require the person seeking to avoid the effect of an otherwise applicable arbitration clause to plead a claim for sexual assault or sexual harassment much less require the courts to determine that such person pleaded a claim upon which relief can be granted.  Congress knows how to use such language when it so chooses.  *See, e.g.*, 2 U.S.C. § 1405 ("A hearing officer may dismiss any claim that the hearing officer finds to be frivolous or that fails to state a claim upon which relief may be granted.").  In other circumstances, Congress has required the courts *sua sponte* to determine whether the plaintiff has stated a well-pleaded claim for relief before the case can proceed.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (requiring courts to dismiss complaint filed in forma pauperis if it "fails to state a claim on which relief may be granted"); *id.* § 1915A(b)(1) (court must *sua sponte* screen prisoner complaint and dismiss it if the complaint "fails to state a claim upon which relief may be granted").  Congress' decision not to use such language in the EFAA must be understood to be considered.

There are other textual indicia of Congress' intent.  When identifying the cases governed by the EFAA, Congress elected to refer to the nature of the disagreement between the parties rather than to its legal substance in a form that is readily measured by a motion to dismiss.  "Disputes," unlike claims, are not subject to motions to dismiss.  Congress' language in defining what constitutes a sexual harassment dispute highlights the point.  Congress easily could have used parallel language to that which it used with respect to sexual assault disputes and defined sexual harassment disputes as "involving conduct that constitutes sexual harassment under applicable Federal, Tribal, or State law."  It did not.  Congress added the words "is alleged to constitute."

9 U.S.C. § 401(4).[10]   The courts are instructed to give meaning to all of the words chosen by Congress and to avoid a reading that renders statutory language mere surplusage.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute [courts] are obliged to give effect, if possible, to every word Congress used.").  Congress uses each of the words in a statute purposefully.  *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018); *Russello v. United States*, 464 U.S. 16, 23 (1983).  The most natural way to effect to the EFAA's language is if what is necessary is not conduct that constitutes sexual harassment but conduct that is alleged to constitute sexual harassment.

Finally, Defendant cites to the reasoning in *Yost* that by "enacting a statute that expressly refer[s] to allegations of violations of law, it is reasonable to infer that Congress in 2022 was aware that only viably pled (that is, plausible) allegations of sexual harassment law had the capacity to proceed past the pleading stage in federal court."  Dkt. No. 46 at 6 (quoting *Yost*, 657 F. Supp. 3d at 585.  As an initial matter, the premise of that argument is mistaken.  Cases routinely proceed past the pleading stage even if they do not plausibly state a claim for relief.  A defendant may choose for whatever reason not to challenge the plausibility of a plaintiff's allegations; the court in that circumstance still has the capacity to preside over the matter.  Moreover, the EFAA speaks to "allegations," *i.e.* the content of a pleading, and not to the conclusion that those allegations plausibly state a claim for relief if the pleading is challenged under Rule 12(b)(6).  In the very line of cases to which the *Yost* court referred, the Supreme Court itself drew a distinction between the

---

[10] An earlier draft of the EFAA included more a more limited definition of "sexual harassment dispute" that specified certain conduct constituting sexual harassment for the purposes of the EFAA to the exclusion of any unspecified conduct.  *See* Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, H.R. 445, 117th Cong. (2d Sess. 2022).  However, the bill was amended to "embrac[e] sexual harassment jurisprudence, which encompasses a broader array of harassing conduct."  168 Cong. Rec. H991 (daily ed. Feb. 7, 2022) (statement of Rep. David Scott).

two.  *See Iqbal*, 556 U.S. at 678 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." (citation and alterations omitted)); *accord Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020); *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013).  The person who files a pleading in federal court need only represent that the allegations make out a claim under existing law or that there is a non-frivolous argument for the extension, modification, or reversal of existing law such that the allegations make out a claim.  Fed. R. Civ. P. 11(b)(2).  It is for the court to determine whether those allegations state a claim for relief. The fact that Congress, which is presumed to legislate against the backdrop of established law, chose not to include a requirement in the EFAA that the complaint state a claim for relief (language Congress used in other statutes) suggests that Congress did not intend for the courts on their own authority to impose such a requirement before a plaintiff was relieved of the obligation to proceed by way of forced arbitration.  *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233–34 (2020) ("We normally assume that Congress is aware of relevant judicial precedent when it enacts a new statute" (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010))).

Indeed, the Second Circuit has recognized that the EFAA does not require that the plaintiff expressly style their claim as one for sexual harassment or sexual assault.  In *Olivieri*, the Second Circuit held that the EFAA applied to a plaintiff's claims for retaliation-based hostile work environment.  112 F.4th at 92.  The Circuit found that while the alleged retaliatory conduct may not itself involve sexual harassment or assault, "retaliation resulting from a report of sexual harassment is 'relat[ed] to conduct that is alleged to constitute sexual harassment'" and thus is a "sexual harassment dispute" within the meaning of the EFAA.  *Id.* (quoting 9 U.S.C. § 401(4));

34

*accord Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 181 (S.D.N.Y. 2023) ("[T]here is nothing in the text of the EFAA that suggests its applicability hinges on how a claim is labeled."). But, the Second Circuit also has held that a "[a] plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *accord Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). The issue on such a claim is whether the plaintiff was retaliated against for reporting sexual harassment, not the plausibility of the underlying harassment claim. It would be inconsistent with this Second Circuit precedent to require a plaintiff alleging retaliation to plead a claim of sexual harassment sufficient to state a claim to relief. [11] The Second Circuit's decision in *Olivieri* thus strongly suggests that a plaintiff need not state a claim for sexual harassment intent to be considered to have made allegations "relating to conduct that is alleged to constitute sexual harassment."

Thus, to invoke the EFAA, a person subject to an arbitration agreement must allege (1) a dispute; (2) conduct and that such conduct, if established, constitutes sexual harassment pursuant to an applicable Federal, Tribal, or State law; and (3) that the dispute relates to such conduct.[12]

---

[11] Ending forced arbitration for standalone claims of retaliation based on sexual assault or harassment reporting is also consistent with Congress' intent that the EFAA combat "the growth of office cultures that ignore harassment and retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers." H.R. Rep. 117-234 at 4.

[12] This third requirement does not present a high bar. "The phrase 'relating to' is deemed synonymous to 'in connection with,' 'associated with,' 'with respect to,' and 'with reference to.'" *Kamagate v. Ashcroft*, 385 F.3d 144, 154 (2d Cir. 2004) (citation omitted); *accord Prus v. Holder*, 660 F.3d 144, 148 (2d Cir. 2011). Moreover, "Congress's use of the phrase 'relating to' in federal legislation generally signals its expansive intent." *Mizrahi v. Gonzales*, 492 F.3d 156, 159 (2d Cir. 2007) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)); *see also Bristol-Myers Squibb Co. v. Superior Ct. of*

The alleged conduct need not ultimately be found to actually constitute sexual harassment so long as the plaintiff alleges that the conduct constitutes sexual harassment.

## 2. The Statutory Scheme

This interpretation is not only consistent with the text of the EFAA but also is supported by good sense and would avoid deleterious procedural ramifications. *See Van Buren v. United States*, 593 U.S. 374, 392 (2021) (describing statutory definitions as "mak[ing] sense" when viewed in connection with the purpose of the statutory scheme).

The Rule 12(b)(6) standard is designed to test whether the plaintiff's allegations, if proven, would entitle the plaintiff to relief on the claims that the plaintiff has asserted. *See Cornelio v. Connecticut*, 32 F.4th 160, 168 (2d Cir. 2022). If the defendant prevails on a Rule 12(b)(6) motion, it is entitled to judgment on the merits. *See Slayton v. Am. Exp. Co.*, 460 F.3d 215, 225 (2d Cir. 2006); *Conn. Nat. Bank v. Fluor Corp.*, 808 F.2d 957, 960 (2d Cir. 1987). The decision dismissing the complaint is entitled to claim preclusive effect, preventing the plaintiff from bringing any claim that the plaintiff brought or could have brought in the case. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398–99 & n.3 (1981); *Saud v. Bank of N.Y.*, 929 F.2d 916, 918 (2d Cir. 1991). If the court dismisses the claim, the plaintiff cannot bring the same claim in that court or in any other court. *See Collard v. Inc. Vill. of Flower Hill*, 759 F.2d 205, 207 (2d Cir. 1985); *Lipin v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F. Supp. 2d 126, 135–36 (S.D.N.Y. 2002). For those reasons and others, the default rule in federal court is that the plaintiff whose complaint is

---

*Cal., S. F. Cnty.*, 582 U.S. 255, 262 (2017) (holding that the requirement that a suit arise out of or *relate to* the defendant's contacts with the forum for specific jurisdiction to lie means that "there must be an affiliation between the forum and the underlying controversy" (citation omitted)); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (holding that the rule that specific jurisdiction attaches to suits "relat[ing] to the defendant's contacts with the forum" does not require a "strict causal relationship between the defendant's in-state activity and the litigation" (citation omitted)). Such expansive wording further underscores the broad application that the EFAA was written to have.

dismissed for failure to state a claim for relief is given leave to replead.  *See Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (citing 2A Moore & Lucas, Moore's Federal Practice ¶ 12.14 at 12–99 (2d ed. 1989); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)); *Golla v. Neovasc, Inc.*, 2023 WL 2469770, at *3 (2d Cir. Mar. 13, 2023) ("[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint" (citations omitted)).  A complaint that may not pass the plausibility test at the first pass may survive after the pleader has the benefit of a decision setting forth the court's expectations as to what must be pled or the benefit of some discovery.  If, after a second opportunity to plead a claim, the claims still fails and there is no further opportunity to replead, then the defendant is free from the claim.  The plaintiff has a right to take an appeal.  However, unless and until the district court judgment is reversed, the defendant does not have to defend its conduct in the district court or in any other tribunal, including an arbitral tribunal.  *See Credit Suisse AG v. Graham*, 533 F. Supp. 3d 122, 135 (S.D.N.Y. 2021) (noting that if the arbitrator "ignores principles of res judicata . . . in a manner that results in a decision in manifest disregard of the law, the losing party may pursue its arguments through a motion to vacate in federal court"); *Crawley v. Macy's Retail Holdings, Inc.*, 2018 WL 4954099, at *3 (S.D.N.Y. Oct. 11, 2018) (noting that "the arbitrator found that 'dismissal as a matter of law is warranted' because 'the material facts of this case are not at issue as they have previously been found to be without merit'").

By contrast, a motion to compel arbitration is designed to test who—a judge and jury or an arbitrator—is to decide the case on the merits.  It goes to adjudicative capacity.  The determination of whether an arbitration agreement applies to a case is one that must be made at the outset of the case before the court has invested its resources lest the defendant through its silence and complicity be deemed to waive arbitration.  *See Pacelli*, 459 F. Supp. 3d at 616.  If the court lacks adjudicative

capacity, *i.e.*, if the case belongs in arbitration, then the court should not be making substantive decisions. *See Bell*, 327 U.S. at 682 ("[T]he court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy."); *Spruill v. NYC Health & Hosp.*, 2007 WL 2456960, at *1 (S.D.N.Y. Aug. 23, 2007) (The assessment of jurisdiction must be resolved first because "a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction."), *aff'd sub nom. Spruill v. N.Y.C. Health & Hosps. Corp.*, 367 F. App'x 269 (2d Cir. 2010). "[I]n deciding a motion to compel arbitration, the Court 'is strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator.'" *Shukla v. Viacom Inc.*, 2019 WL 1932568, at *12 (S.D.N.Y. May 1, 2019) (quoting *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991)). Indeed, the Supreme Court has ruled that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT & T Techs.*, 475 U.S. at 649. As Justice Brennan stated in somewhat stronger language, when faced with a question of arbitrability, the courts "have no business weighing the merits of the grievance[] [or] considering whether there is equity in a particular claim." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960).

The Rule 12(b)(6) standard is ill-suited to the court's task under the EFAA. The court's decision on a Rule 12(b)(6) motion is the first word but often not the last word on the merits of a claim. A complaint may be filed quickly to give the defendant notice of the claim and to satisfy a statute of limitations. In the ordinary course, while the motion is pending, discovery proceeds. "A motion to dismiss does not automatically stay discovery, except in cases covered by the Private Securities Litigation Reform Act." *Hong Leong Fin. Ltd. (Sing.) v. Pinnacle Performance Ltd.*,

297 F.R.D. 69, 72 (S.D.N.Y. 2013). The pleader may not know what is expected of his pleading from the particular district court judge to whom her case is assigned. Thus, "to hold that the nonmovant's allegations of fact are . . . insufficient to fend off a motion to compel arbitration would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 51 (2d Cir. 2022) (citation and alterations omitted)). Moreover, if, in the ordinary course, a Rule 12(b)(6) motion to dismiss is granted and the complaint is dismissed with prejudice, the plaintiff is entitled to an immediate appeal. 28 U.S.C. § 1292. It is only the defendant who loses the motion, but who still is able to defend the claim on the merits, who does not have a right to immediate appeal. *See Catlin v. United States*, 324 U.S. 229, 236 (1945); *In re Roman Cath. Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 36 (2d Cir. 2014) (per curiam). It is in that manner, through decisions by the appellate courts on the close facts of disputed cases, that the law is developed and refined. *See, e.g.*, *Yu v. City of New York*, 792 F. App'x 117, 118 (2d Cir. 2020) (summary order); *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 269 (2d Cir. 2016) (summary order); *Patane v. Clark*, 508 F.3d 106, 117 (2d Cir. 2007).

The Rule 12(b)(6) motion to dismiss decided in the guise of a motion to compel arbitration reverses the customary order of procedure. The defendant who loses the motion to compel arbitration because the court has determined that the complaint states a claim for relief is accorded the appeal that Congress, which was attendant to the risks of interlocutory appeals, intended to deny decisions sustaining a complaint and permitting discovery to go forward. 9 U.S.C. § 16(a); *see Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) ("Congress provided for immediate interlocutory appeals of orders denying—but not of orders granting—motions to compel arbitration."). By contrast, the decision that the complaint does not state a claim for relief would not be immediately appealable, simply because it is cloaked in the garb of a motion to compel

arbitration.  9 U.S.C § 16(b); *see Katz v. Cellco P'ship*, 794 F.3d 341, 346 (2d Cir. 2015) ("[T]he FAA explicitly denies the right to an immediate appeal from an interlocutory order that compels arbitration or stays" the litigation pending arbitration.).  The claimant who loses the motion cannot protest the court's determination until the arbitration concludes, suffering the precise injury that the EFAA was intended to avoid.  *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (noting injury associated with "being forced to expend time and resources arbitrating an issue that is not arbitrable" (quoting *Md. Cas. Co. v. Realty Advisory Board on Lab. Relations*, 107 F.3d 979, 985 (2d Cir. 1997))).  While in the ordinary course, a successful Rule 12(b)(6) motion gives rise to an opportunity to replead, no such practice exists when a motion to compel is granted because the complaint fails to meet the Rule 12(b)(6) standard.  Moreover, it is not always apparent what constitutes sexual harassment and what does not; one judge's view of what is sufficient might diverge from the view of another judge.  *Compare Goodwine v. City of New York*, 2016 WL 3017398, at *7 (S.D.N.Y. May 23, 2016) (holding that plaintiff failed to state a claim for hostile work environment under Title VII) *with Jansson v. Stamford Health, Inc.*, 2017 WL 1289824, at *20 (D. Conn. Apr. 5, 2017) (finding similar allegations sufficient to state a claim for hostile work environment under Title VII).  The motion to dismiss through motion to compel thus not only prematurely terminates the plaintiff's claim, but also threatens to stunt the development of the law.

### 3.    Congressional Purpose

The legislative history of the FAA as amended by the EFAA does not speak directly to the standard a court is to apply in determining whether to grant a motion to compel arbitration.  The little legislative history that does touch upon the question, however, is consistent with the notion that it is all persons who are parties to sexual harassment disputes and who assert claims relating to those disputes, and not just those who plausibly state a claim for relief for sexual harassment,

who are free from forced arbitration.  Senator Durbin, Chair of the Senate Judiciary Committee, clarified during a debate on the Senate floor:

> [T]he bill text does not require any court to adopt new dismissal mechanisms for survivors' claims.  Current State or Federal law governs how and when a case moves forward, and the bill does not create any new mechanism to allow for dismissal, nor does it require that victims have to prove a sexual assault or harassment claim before the rest of their related case can proceed in court.

168 Cong. Rec. S626 (daily ed. Feb. 10, 2022) (statement of Sen. Richard Durbin).

Defendants suggest that the Court must apply a plausibility standard on a motion to compel in order to satisfy the congressional intent and the liberal pro-arbitration policy reflected in the FAA.  *See* Dkt. No. 46 at 7 (arguing that "[t]his construction would 'affront Congress's intent in enacting the FAA.'" (quoting *Yost*, 657 F.Supp.3d at 586)).  The Court believes that argument to be mistaken.  While the FAA has a policy in favor of arbitration, that policy is not unqualified.  Although the Supreme Court has stated that the FAA reflects a "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Conception*, 563 U.S. 333, 339 (2011), that mandate may be "overridden by a contrary congressional command," *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (citation omitted); *see also Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233, (2013) ("[C]ourts must rigorously enforce arbitration agreements according to their terms . . . unless the FAA's mandate has been overridden by a contrary congressional command." (citations omitted)).  The EFAA is not in conflict with the FAA.  *Cf. Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018).  It is part of the FAA.  And the FAA itself does not reflect a view that an arbitration agreement is enforceable in all circumstances.  By its own text, prior to its amendment by the EFAA, the statute did not require a transportation worker who signed a predispute arbitration agreement to honor that agreement.  9 U.S.C. § 1.  The FAA exempts from its coverage seamen, railroad workers, and transportation workers who play a necessary role in the free flow of goods based, in part, on a congressional judgment that the rights of such persons who were injured should

41

not be addressed by the broad FAA but by "statutes specific to them." *Cir. City Stores*, 532 U.S. at 121; *see also Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 253  (2024).  There is no reason to presume that, in amending the FAA through the EFAA, Congress intended to extend victims of sexual harassment any less solicitude.  Giving credence to the broad language with which Congress sculpted the EFAA supports—rather than affronts—Congress' intent.  *See* H.R. Rep. No. 117-234 at 3–6, 8–11.[13]  There is no reason to subordinate the EFAA—which works solely to carve out a discrete category of cases for which no predispute arbitration agreement is valid or enforceable—to the FAA's policy promoting enforcement of valid arbitration agreements.

Defendant also argues that the EFAA's purpose "is to empower sexual harassment claimants to pursue their claims in a judicial . . . forum" and, in the case of insufficiently pleaded sexual harassment claims, "[t]hat purpose would 'not be served by requiring the remaining (that is, non-sexual harassment) claims in the case to be litigated in court in the face of a binding arbitration agreement.'" Dkt. No. 46 at 6–7 (quoting *Yost*, 657 F. Supp. at 586).  That conclusion is necessarily based on the dual presumptions that (1) the EFAA covers only complaints that make a claim for sexual harassment and (2) it would be inconsistent with Congress' intent if a complaint that contained an insufficient allegation of sexual harassment is nonetheless permitted to go forward in federal court.  Neither conclusion appears to be well-founded.  The EFAA covers not only complaints that fall within the four corners of a tort for sexual assault or sexual harassment but also complaints containing claims that relate to a sexual assault or sexual harassment dispute.

---

[13] In fact, *Johnson*, the companion case to *Yost*, recognized the EFAA's express rejection of another FAA norm.  657 F. Supp. 3d at 558–61 (holding that the EFAA blocks arbitration as to the entire case rather than just the claims of sexual harassment or assault).  The *Johnson* court held that "Congress's choice to amend the FAA directly with text broadly blocking enforcement of an arbitration clause with respect to an entire 'case' 'relating to' a sexual harassment dispute reflects its rejection—in this context—of the FAA norm of allowing individual claims in a lawsuit to be parceled out to arbitrators or courts depending on each claim's arbitrability." *Id.* at 561.

*See, e.g.*, *Olivieri*, 112 F.4th at 92.  And the plausibility standard of Rule 12(b)(6) is not a test for whether a court may hear a case.  It is an optional tool, and only one of several optional tools, by which the adverse party can seek to have a complaint dismissed after jurisdiction is established.  The fact that the victim of sexual harassment who fails to state a legally sufficient claim for sexual harassment is nonetheless relieved of forced arbitration in a case that relates to the sexual harassment is not an affront to Congress' intent but rather is a feature of the congressional design.  *See Johnson*, 657 F. Supp. 3d at 559 ("[T]he text of § 402(a) makes clear that its invalidation of an arbitration agreement extends to the entirety of the case relating to the sexual harassment dispute, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute.").

### 4.    Defendants' Policy Argument

Finally, Defendants retreat to a policy argument.  They contend that "reading the EFAA to 'void arbitration agreements after the point at which plaintiffs have proven themselves unable to plead claims of sexual harassment . . . would enable a plaintiff to evade a binding arbitration agreement . . . by the expedient of adding facially unsustainable and quickly dismissed claims of sexual harassment.'"  Dkt. No. 46 at 7 (quoting *Yost*, 657 F. Supp. 3d at 586).

There is no reason to presume that the EFAA's plain language will invite a slew of false claims of sexual harassment or sexual assault by persons seeking to avoid an otherwise applicable arbitration agreement or that the plausibility test would either be necessary or sufficient to meet that concern.  The work that Defendants would have Rule 12(b)(6) do is already done by tools that exist under federal law.  A litigant is prohibited under Federal Rule of Civil Procedure 11 from filing falsified claims. [14]  Rule 11 is a potent weapon against the filing of false or frivolous claims

---

[14] Rule 11 permits a party to obtain sanctions against an attorney, law firm, or party that falsely

or those made for an "improper purpose." Fed. R. Civ. P. 11(b). Such claims are not readily weeded out by Rule 12(b)(6) which addresses only the legal sufficiency of the pleadings. A plaintiff intent on avoiding an arbitration agreement and unscrupulous enough to add false claims of sexual harassment to do so would surely be sufficiently intent and artful to make sure that the false allegations satisfy the *Twombly*/*Iqbal* threshold.

The Court also need not depart from the plain language of the EFAA or apply the *Twombly*/*Iqbal* screen to address the concern that a party intent on avoiding arbitration will include "facially unsustainable and quickly dismissed claims of sexual harassment," *Yost*, 657 F. Supp. 3d at 586, for the sole purpose of avoiding an arbitration agreement and obtaining a federal forum. The federal law already contains tools to address that concern even beyond Rule 11.

In *Bell v. Hood*, the Supreme Court held that, even if a complaint purported to allege violation of a federal law, a suit could "be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes *clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction* or *where such a claim is wholly insubstantial and frivolous*." 327 U.S. at 682–83 (emphases added); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (same); *Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 306 (2d Cir. 2003) ("Thus, in order to sustain federal jurisdiction, the complaint must allege a claim that arises under

---

represents that "the factual contentions have or will have evidentiary support . . . after a reasonable opportunity for further investigation or discovery" or that "the claims, defenses, and other legal contentions are warranted by existing law." Fed R. Civ. P. 11. Courts have punished litigants for such behavior in the past. *See, e.g.*, *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 408 (S.D.N.Y. 2016) ("[B]ecause the Court finds that plaintiff has fabricated the critical allegations in her Amended Complaint, the Court imposes sanctions."); *Amorosa v. Ernst & Young LLP*, 2010 WL 245553, at *4–5 (S.D.N.Y. Jan. 20, 2010) (imposing sanctions for filing frivolous repetitive suit); *Pentagen Techs. Int'l Ltd. v. United States*, 172 F. Supp. 2d 464, 473 (S.D.N.Y. 2001) (imposing sanctions for bad-faith litigation tactics where "plaintiffs' counsel has engaged in a pattern of litigation designed to evade previous rulings"), *aff'd*, 63 F. App'x 548 (2d Cir. 2003).

the Constitution or laws of the United States and that is neither made solely for the purpose of obtaining jurisdiction nor wholly insubstantial and frivolous."). At the same time, the Supreme Court also rejected the view that only complaints that state a claim for relief under federal law "arise[] under the Constitution or laws of the United States." *Bell*, 327 U.S. at 683 (citation omitted). The sufficiency of the claim could not inform jurisdiction because "[w]hether the complaint states a cause of action on which relief could be granted is a question of law and . . . must be decided after and not before the court has assumed jurisdiction over the controversy." *Id.*

The Supreme Court found that the *Bell v. Hood* standard is adequate to protect state court jurisdiction; it is no toothless safeguard. *See, e.g.*, *Nachbaur v. St. Luke's-Roosevelt Hosp. Ctr.*, 101 F.3d 687 (2d Cir. 1996) (affirming dismissal for lack of subject matter jurisdiction where RICO claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" (quoting *Bell*, 327 U.S. at 682)); *Dante v. Ralphs Supermarket*, 2024 WL 4188926, at *2 (S.D.N.Y. Sept. 11, 2024) (finding no federal question jurisdiction lies because "[m]ere invocation of federal jurisdiction, without any facts demonstrating a federal law claim, does not create federal subject matter jurisdiction"); *Hall v. NYC Water Board*, 2024 WL 4487257, at *4 (S.D.N.Y. Oct. 15, 2024) (same).

The test also reads easily onto the EFAA. Congress' use of the words "conduct" and "applicable" make clear that the conduct must be actually alleged and with sufficient specificity that the court is able to determine the law that is applicable and that there is a real and nonfrivolous reason to believe that the conduct violates that law against sexual harassment. A claim that is "wholly insubstantial and frivolous" or that "appears to be immaterial and made solely for the purpose of obtaining jurisdiction" will not do. *Bell*, 327 U.S. at 683. The Supreme Court held that

the *Bell v. Hood* test is sufficient to protect the interests of the state courts. It should also be sufficient to protect the prerogatives of the arbitrator. *See AT & T Techs.*, 475 U.S. at 649.

      **5.**      **Application of the Standard**

Defendants' attacks on Plaintiff's pleading of sexual harassment illustrates why the *Bell v. Hood* standard and not the *Twombly*/*Iqbal* standard is the appropriate one for determining arbitrability. Defendants argue that Plaintiff's allegations are "conclusory and vague," Dkt. No. 37 at 32, and are "undated," and do not specify where the impact of the sexual harassment was felt, *id.* at 30. Were those arguments well-founded, the response should be to permit Plaintiff to replead. *See Golla*, 2023 WL 2469770, at *3; *Ronzani*, 899 F.2d at 198. The assumption would be that Plaintiff could state a claim for relief. *Cf. Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (noting that leave to amend should be granted where the complaint "suggests that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe"). The response would not be to dismiss the complaint and deny the plaintiff a federal forum. But, under Defendants' proposed test, that is exactly the result that would follow. Plaintiff would be held to a higher standard than even the standard under Rule 12(b)(6) and denied the second chance that every other plaintiff in federal court would be given. The result could hardly be otherwise under Defendants' test, lest the speed and efficiency a motion to compel arbitration is intended to accomplish be swallowed by the care and process required before a complaint is dismissed on the merits.

The complaint satisfies the test of relating to a "sexual harassment dispute" under applicable Federal, Tribal, or State law. 9 U.S.C. § 401(4). Federal and New York City[15] statutory

---

law do not contain a separate violation for sexual harassment *per se* and sexual harassment is not itself a free-standing tort under New York common law.  Federal and New York City statutory law proscribe discrimination more broadly, 42 U.S.C. § 2000e-2(a)(1); N.Y.C. Admin. Code § 8-107; *see also Singh I*, 2024 WL 3904799, at *4, and at common law, sexual harassment is not a stand-alone tort but, at best, considered a form of assault or punished under torts such as intentional infliction of emotional distress, *see* Restatement (Third) of Torts §§ 3, 19, 46 cmt. n (2012) ("Although battery and assault liability sometimes provide a remedy for sexual harassment, many forms of harassment do not fall within the scope of these torts.").

Congress enacts laws intending that they will have meaning.  *See Fischer v. United States*, 603 U.S. 480, 487 (2024).  And Congress passes laws against a backdrop of case law interpretation. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 117 (2002) (holding that Congress is "presumed to have known of this settled judicial treatment of oath requirements when it enacted and later amended Title VII"); *Merck & Co.*, 559 U.S. at 648 ("Given the history and precedent surrounding the use of 'discovery' in the limitations context generally as well as in this provision, the reasons for making this assumption are particularly strong here."); *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (presuming Congress is aware of "longstanding" and "settled" judicial penchant to borrow from analogous state law).  Sexual harassment dispute has to mean something other than an intentional touching of certain body parts with the intent to humiliate, harass, or gratify, which is already picked up by the definition of sexual assault.[16]

---

[16] Specifically "sexual assault" is defined by reference to 18 U.S.C. § 2246 which includes as "sexual contact" the "intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  18 U.S.C. § 2246(3).

Long before Congress passed the EFAA, the Supreme Court announced the now-settled proposition that Title VII's proscription against discrimination because of sex "includes sexual harassment" claims. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998) (stating that harassment claims fall within the coverage of Title VII); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex that supervisor 'discriminate[s]' on the basis of sex"); *id.* at 66 ("Nothing in Title VII suggests that a hostile environment based on discriminatory *sexual* harassment should not be likewise prohibited."); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (noting that the conduct in *Meritor* presented "egregious examples of harassment" but did not mark the boundary of what was actionable); *Landgraf v. USI Film Prod.*, 511 U.S. 244, 250 (1994) (assuming for the purposes of the opinion "that petitioner was the victim of sexual harassment violative of Title VII"); *Penn. State Police v. Suders*, 542 U.S. 129, 146–47 (2004) (holding that claim for constructive discharge "can be regarded as an aggravated case of[] sexual harassment or hostile work environment" compensable under Title VII); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (noting the conditions under which "sexual harassment is actionable under Title VII"); *see also Olivieri*, 112 F.4th at 89; (stating that "sexual harassment disputes . . . are prototypical hostile work environment claims" (citations omitted)).[17]    In interpreting Title VII, the courts (including the Supreme Court) have distinguished between disparate treatment claims which do not necessarily involve sexual harassment and claims of quid

---

[17] The Supreme Court has noted that the terms "quid pro quo" and "hostile work environment" "appeared first in the academic literature, *see* C. MacKinnon, Sexual Harassment of Working Women (1979); found their way into decisions of the Courts of Appeals, *see, e.g.*, *Henson v. Dundee*, 682 F.2d 897, 909 (11th Cir. 1982); and were mentioned in this Court's decision in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998) (internal citations altered) (citing E. Scalia, The Strange Career of Quid Pro Quo Sexual Harassment, 21 Harv. J.L. & Pub. Policy 307 (1998)).

pro quo or hostile work environment which sound in sexual harassment. Sexual harassment is actionable under a quid pro quo theory, where "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006). "For sexual harassment to be actionable under the hostile work environment theory, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 65 (quoting *Henson*, 682 F.2d at 904); *Breeden*, 532 U.S. at 270. Courts evaluating a claim for hostile work environment sexual harassment look to whether the harassment altered the conditions of the plaintiff's employment, thereby creating an abusive working environment. *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001). Courts consider whether the conduct allegedly constituting harassment "is physically threatening or humiliating, or a mere offensive utterance; and . . . whether it unreasonably interferes with the employee's 'work performance.'" *Bermudez v. City of New York*, 2015 WL 1500235, at *8 (S.D.N.Y. Mar. 31, 2015) (quoting *Harris*, 510 U.S. at 23). It is fair to presume that Congress, which would have been aware of this long line of caselaw, intended to capture both forms of sexual harassment when it defined a sexual harassment dispute by reference to a dispute alleging sexual harassment under federal law.

New York State law is more clear. By statute passed in 2019, the New York State Human Rights Law expressly proscribes harassment on the basis of sex. *See* 2019 Sess. Laws Ch. 160 (A. 8421) (McKinney). Until 2019, claims for sexual harassment brought under the NYSHRL were considered "analytically identical to claims brought under Title VII," *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citation omitted), and therefore sexual harassment was unlawful under state law if it took the form of either a quid pro quo or hostile work environment, *see Pedrosa v. City of New York*, 2014 WL 99997, at *6 (S.D.N.Y. Jan. 9, 2014).

Even after the NYSHRL was amended, courts have continued to look to whether claims of sexual harassment are brought as quid pro quo claims or hostile work environment claims. *See Maiurano v. Cantor Fitzgerald Sec.*, 2021 WL 76410, at *3 (S.D.N.Y. Jan. 8, 2021) ("Plaintiff's sexual harassment claims will survive a motion to dismiss if her pleading adequately alleges conduct that meets the criteria for either type of claim."). Because Congress defined sexual harassment dispute by reference to conduct defined by a state whose laws are applicable to the defendant's conduct as sexual harassment, an allegation of sexual harassment under New York State law would fall within the EFAA as long as such claim satisfies the *Bell v. Hood* standard.

New York City law is less clear. The New York City Human Rights Law, much like Title VII, does not contain a definition for the term of sexual harassment but prohibits discrimination on the basis of sex generally. "In interpreting alleged discrimination under the NYCHRL, state and federal courts have yet to draw a clear line between what constitutes 'sexual harassment' and what constitutes 'gender discrimination.'" *Singh I*, 2024 WL 3904799, at *4. Indeed, for the purpose of merits evaluation, New York state and federal courts treat claims of sex-based discrimination and sexual harassment indistinguishably under the NYCHRL. *See Williams v. N.Y.C.H.A.*, 872 N.Y.S.2d 27, 37 (1st Dep't 2009) ("Despite the popular notion that 'sex discrimination' and 'sexual harassment' are two distinct things, it is, of course, the case that the latter is one species of sex- or gender-based discrimination" under the NYCHRL.). One court in this District has held that sexual harassment can be distinguished from gender discrimination more generally because the former typically involves conduct "of [a] romantic, sexual or lewd nature." *Singh I*, 2024 WL 3904799, at *5; *see also Singh II*, 2024 WL 4635482, at *3. It also is reasonable to believe that, under New York City law, sexual harassment is distinguished from discrimination on the basis of sex more generally because it involves either a quid pro quo or a hostile work

environment based on sex. *See Singh I*, 2024 WL 3904799, at *4 (noting that the NYCHRL "state[s] in several provisions that sexual harassment is 'a form of unlawful discrimination,' indicating that the terms 'gender discrimination' and 'sexual harassment' are not coextensive under the statute." (citing N.Y.C. Admin. Code §§ 8-107(29)(b), 8-107(30)(b)(1), 8-132(a)(1)(a))); *Singh II*, 2024 WL 4635482, at *3 (noting that the New York State Division of Human Rights gives examples of sexually harassing conduct including "[r]equests for sexual favors, which may be accompanied by implied or overt threats concerning one's job performance evaluation or promotion," "[v]erbal harassment or abuse in the form of a pattern of sexual comments or questions," and "[d]isplays of lewd photographs or drawings"). Thus, on the facts, *Singh* can be understood to have held that hostile work environment and quid pro quo claims, but not other disparate treatment claims, involve "sexual harassment."

Wherever the bar is placed, Plaintiff meets it. Plaintiff alleges that the conduct of the Defendants constitutes sexual harassment under New York State and New York City law and those allegations are neither frivolous and wholly insubstantial nor immaterial nor made solely for the purpose of avoiding arbitration. *See Dante*, 2024 WL 4188926, at *2; *Hall*, 2024 WL 4487257, at *4. Plaintiff alleges specific facts, including that, in connection with her job responsibilities, Mr. and Ms. Hermes encouraged Plaintiff to flirt with potential clients, to use her appearance to attract business, and to become romantically involved with individuals in the industry, Dkt. No. 30 ¶¶ 69–71; that Mr. Hermes "fixated" on Plaintiff's appearance by directing her to fix her makeup and accusing her of looking tired but did not fixate on male employees' appearances, *id.* ¶¶ 72–74; that Mr. Hermes placed Plaintiff into a physically "compromising" position by sliding behind her on a scooter, *id.* ¶ 75; and that Mr. Hermes compared Plaintiff to a piece of steak at a business dinner, *id.* ¶ 76. The alleged conduct—particularly that it was a term and condition of her

employment that Plaintiff become romantically involved with potential clients—is alleged to satisfy, and readily satisfies, at least the New York State and New York City standards for sexual harassment. An employee need not be encouraged to have sex with their boss to be the victim of sexual harassment; it is enough that the employer make clear that one of the terms of employment is that the employee attempt to become romantically involved with third parties. *See Regan v. Benchmark Co. LLC*, 2012 WL 692056, at *10 (S.D.N.Y. Mar. 1, 2012); *Rodriguez v. Express World Wide, LLC*, 2014 WL 1347369, at *2 (E.D.N.Y. Jan. 16, 2014), *report and recommendation adopted*, 2014 WL 1350350 (E.D.N.Y. Mar. 31, 2014).

As further discussed below, Plaintiff alleges facts that would support the inference that New York City and New York State law are "applicable." Her complaint can be read to suggest that she was in New York at the time of the alleged conduct and felt its effects here.

Finally, the case "relates" to the sexual harassment dispute. Plaintiff's allegations of harassment are not immaterial to her claims in this lawsuit. They are a part of the employment relationship from which all of her claims stem.

Defendants' motion to compel arbitration is denied.

## III.    VENUE

Defendants argue that venue is improper because (1) the arbitration agreement acts as a forum selection clause and (2) a substantial part of the events giving rise to Plaintiff's claims occurred in Dallas, Texas. Dkt. No. 37 at 22–26; Dkt. No. 46 at 12–15. Finally, Defendants argue that even if the Court finds that venue is proper in the Southern District of New York, "the Court should nonetheless transfer the matter to the Northern District of Texas" pursuant to 28 U.S.C. § 1404(a) or under the doctrine of *forum non conveniens*. Dkt. No. 37 at 26–29; Dkt. No. 46 at 15–17.

## A.    Venue is Not Improper

Defendants argue that Plaintiff fails to establish that venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(b).  That statute provides that venue is appropriate in:

> 1. a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> 2. a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> 3. if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).  Because no Defendant is a resident of New York, Section 1391(b)(2) is applicable here.  Dkt. No. 30 ¶¶ 12–15; *see Dicks*, 2023 WL 2775830, at *5.

"[W]hen a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate."  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005).  "First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims."  *Id.*  "Second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed."  *Id.*  Although the Second Circuit has "caution[ed] district courts to take seriously the adjective 'substantial,'" *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005), Section 1391(b)(2) "does not restrict venue to the district in which the 'most substantial' events or omissions giving rise to a claim occurred," *Daniel*, 428 F.3d at 432.  Nor does it require courts "to determine the 'best venue,' but merely a logical one with a substantial connection to the litigation."  *Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 59 (2d Cir. 2007).  "Multiple judicial districts may be appropriate venues under this provision as long as a substantial part of the underlying events took place in each."  *Dicks*, 2023

WL 2775830, at *5; *see Lehrer v. J&M Monitoring, Inc.*, 2022 WL 2392441, at *7 (S.D.N.Y. July 1, 2022).

Plaintiff alleges that a substantial part of the events giving rise to her claims occurred in this District. Plaintiff's claims sound in tort, contract, and sexual harassment. They are predicated upon allegations of a hostile workplace environment and allegations that Plaintiff's termination was improperly undertaken to divest Plaintiff of her equity compensation. Although Defendants' communications underlying Plaintiff's sexual harassment claims as well as Defendants' communications about Plaintiff's performance, her desire to exercise the options, and her ultimate termination may have originated in Texas, they were directed to Plaintiff in New York. Dkt. No. 30 ¶¶ 44, 64–67; *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 153 (2d Cir. 2001) (holding that "venue in the Southern District of New York was proper" because "[t]hat many of Zhen Hua's communications reached Titan's offices in New York through the Connecticut brokers does not alter the fact that Zhen Hua directed communications to New York"); *Geffner v. Quanta Servs., Inc.*, 2018 WL 6807388, at *4 (S.D.N.Y. Dec. 27, 2018) (finding venue in the Southern District of New York proper where "Defendants also directed communications to [plaintiff's] Manhattan office in which they demanded that he work on Jewish holidays and denied his eligibility for FMLA and ADA leave"); *Sacody Techs., Inc. v. Avant, Inc.*, 862 F.Supp. 1152, 1157 (S.D.N.Y. 1994) (holding that the "substantial part" requirement "may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action").

Plaintiff performed her work in this District for years, Dkt. No. 30 ¶¶ 33, 35–42, 44, 53, and the fact that her "claims of injury allege the disruption of a working relationship that [she] conducted almost exclusively from this District is a strong indicator that those claims are properly

brought here," *Geffner*, 2018 WL 6807388, at *4 (finding venue appropriate for employment discrimination claims where "[p]erhaps most importantly, nearly all of [plaintiff's] work for Defendants was performed within this District."); *accord D'Anzieri*, 2022 WL 17404254, at *9 ("Because Plaintiff alleges that the conduct which gave rise to her surviving claims of sex discrimination, age discrimination, and retaliation occurred while she was working within this District, the Court concludes that venue is proper in this District under Section 1391(b)(2)."). "It is clear that in some cases, the fact that the Plaintiff suffers harm in a particular judicial district is sufficient to satisfy § 1391(b)(2)." *Fedele*, 18 F. Supp. 3d at 317 (quoting *Kirk v. N.Y. State Dep't. of Educ.*, 2008 WL 819632, at *4 (W.D.N.Y. Mar. 25, 2008) (collecting cases)); *see N.Y. Mercantile Exch. v. Cent. Tours Int'l, Inc.*, 1997 WL 370600, at *4 (S.D.N.Y. July 1, 1997) ("The place where the harm occurred is also relevant for venue purposes."). Plaintiff's endurance of the purportedly hostile workplace and her ultimate termination occurred in this District. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 85 (2d Cir. 2001) ("[W]hen a person is employed in New York (or performs a substantial part of the duties of his or her employment in New York), his or her removal from that employment (or from those duties) is a New York event.").

Although it may be true that, as Defendants argue, "a substantial part of the events giving rise to Plaintiff's claims against the Defendants took place in Dallas, Texas; thus, venue is proper there," Dkt. No. 37 at 26, that does not mean that venue is improper here such that dismissal would be required. *See Gulf Ins.*, 417 F.3d at 356 ("[T]he civil venue statute permits venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts."); *Bates v. C & S Adjusters*, 980 F.2d 865, 867 (2d Cir. 1992) (The statute "does not, as

a general matter, require the District Court to determine the *best* venue" (emphasis added)); *accord Daniel*, 428 F.3d at 432.[18]

## B.    Transfer

Defendants argue in the alternative that this case should be transferred to the Northern District of Texas "[f]or the convenience of parties and witnesses, in the interest of justice." Dkt. No. 37 at 26 (quoting 28 U.S.C. § 1404(a)).  The initial inquiry in deciding a § 1404(a) motion to transfer is "whether the case could have been brought in the proposed transferee district." *Herbert Ltd. P'ship v. Elec. Arts, Inc.*, 325 F.Supp.2d 282, 285 (S.D.N.Y. 2004).  It is apparent that the case could have been brought in the Northern District of Texas—Plaintiff does not dispute that general personal jurisdiction over each Defendant lies there, Dkt. No. 30 ¶¶ 12–15, and that a substantial part of the underlying events took place in that district, Dkt. No. 40 at 25–26.  Having determined that the case could have been brought in the Northern District of Texas, the Court considers the following ten factors to determine if transfer is appropriate:

> (1) the convenience of witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the availability of process to compel the attendance of the unwilling witnesses; (5) the location of relevant documents and the relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to the plaintiff's choice of forum; (9) trial efficiency; and (10) the interest of justice, based on the totality of circumstances.

---

[18] Defendants additionally argue that venue is improper in this District because "an arbitration agreement is a type of forum-selection clause," which must be enforced.  Dkt. No. 37 at 22 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362, n.2 (2d Cir. 1993).  However, even if the arbitration clause was valid and could be construed as a valid forum selection clause, that would not make venue in this District improper.  The Supreme Court has held that "venue is proper so long as the requirements of § 1391(b) are met, irrespective of any forum-selection clause."  *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 57 (2013).  A valid forum selection clause may bear strongly on the issue of whether transfer is appropriate, *see NYC Vision Cap., Inc. v. C21FC, LLC*, 2022 WL 2527611, at *3 (S.D.N.Y. July 7, 2022), but it does not render improper venue that is otherwise proper, *see Saba Cap. Master Fund, Ltd. v. ClearBridge Energy Midstream Opportunity Fund Inc.*, 694 F. Supp. 3d 394, 400 n.2 (S.D.N.Y. 2023).

*Jean-Louis v. ACS*, 2022 WL 16857359, at *2 (S.D.N.Y. Oct. 14, 2022); *see Keitt v. N.Y.C.*, 882 F. Supp. 2d 412, 459–60 (S.D.N.Y. 2011); *N.Y. Marine and Gen. Ins. Co. v. LaFarge No. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010).   "District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).

Plaintiff chose New York as the forum, "a decision that is given great weight" particularly given her residence here. *Id.* at 107 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 70–71 (2d Cir. 2001) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

Additionally weighing against transfer, Plaintiff points to this Court's relative familiarity with the state and city laws governing her harassment and unpaid wages claims, as well as New York's interest in enforcing those laws.   Dkt No. 40 at 27–28.   While the Court has no doubt that the Texas court would ably interpret and apply New York law, "[t]here is an appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems . . . in law foreign to itself." *Van Dusen v. Barrack*, 376 U.S. 612, 645 (1964) (citation and punctuation omitted). "[W]hen claims arise under state law, the forum's familiarity 'weighs slightly, but not substantially, against transfer.'" *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2022 WL 17067984, at *9 (S.D.N.Y. Nov. 17, 2022) (quoting *Capitol Recs., LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 368 (S.D.N.Y. 2009)).   Plaintiff's invocation of New York State and City law weighs against transfer. *See Chloe*, 616 F.3d at 173 (holding this "factor favors New

York as the forum state since a state frequently has a 'manifest interest in providing effective means of redress for its residents.'" (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 483 (1985)); *Weekes v. Outdoor Gear Exch., Inc.*, 2023 WL 2368989, at *7 (S.D.N.Y. Mar. 6, 2023) (recognizing that "three factors also weigh in favor of maintaining venue in the Southern District of New York as state law will be applied for the NYCHRL claim" and "in the interest of judicial economy, it would be a burden on the District Court of Vermont to interpret New York law for purposes of resolving this action"); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 360 (S.D.N.Y. 2007) ("[T]he interest of forum-state adjudication is not insignificant, as New York has a particular interest in protecting its residents under its local human rights laws."). However, this argument pertains to only certain of Plaintiff's claims as the conversion, tortious interference, and breach-of-contract claims are governed by Delaware Law. Dkt. No. 30 ¶¶ 43 n.2, 87–90, 96–109.

The relative means of the parties to litigate in a foreign forum leans slightly towards Plaintiff. "Where a disparity between the parties exists, such as an individual plaintiff suing a large corporation, the Court may also consider the relative means of the parties in determining whether to transfer." *Hernandez v. Graebel Van Lines*, 761 F Supp. 983, 989 (E.D.N.Y. 1991). Plaintiff lives and was employed in New York, Dkt. No. 40 at 29, but she owns a property in Texas in which her mother lives and for which she may have sought a general homestead exemption, Dkt. No. 36 ¶ 22; Dkt. No. 38 ¶¶ 15–16. Mr. Hermes is an individual with no ties to New York, and he avers it would be hardship for him to defend the case in New York. Dkt. No. 36 ¶ 5.[19] However, Mr. Hermes' declaration also states that he made several trips to New York in recent

---

[19] Ms. Hermes makes a similar averment, Dkt. No. 35 ¶ 5, but because the Court dismisses the complaint as to Ms. Hermes, that representation does not impact the Court's venue transfer inquiry.

years.  Dkt. No. 36 ¶¶ 34–35, 40, 43, 48–49.  Although Mr. Hermes states that ClaimDeck does not currently have any clients in New York or any contractual relations with parties in New York, *id.* ¶¶ 28–33, he does not dispute that he has traveled to New York for conferences, to check in with Plaintiff, and to discuss potential business relationships, *id.* ¶¶ 34–35, 40, 43, 48–49.  This factor thus tips slightly in favor of Plaintiff.

In support of transfer, Mr. Hermes avers that three of the twelve likely key witnesses or sources of information for this case live in Dallas, Texas (including himself and Ms. Hermes) with an additional five living elsewhere in Texas, including cities within the Eastern and Western Districts of Texas.  Dkt. No. 36 ¶ 86.[20]  Defendants do not offer evidence that such witnesses are within one hundred miles of the Northern District of Texas courthouse and "[f]or a person outside the district and at least a two-hour drive from the courthouse, the Northern District of Texas is not necessarily more convenient to them than the courthouse in New York (or a law office in New York)."  *Wistron Neweb*, 2022 WL 17067984, at *7.  Furthermore, the convenience of party witnesses "does not weigh as heavily as inconvenience to non-party witnesses."  *Wistron Neweb*, 2022 WL 17067984, at *6; *see also Payless Shoesource, Inc. v. Avalon Funding Corp.*, 666 F. Supp. 2d 356, 364 (E.D.N.Y. 2009).  And former employees—as many of Defendants' identified witnesses appear to be—"are not entitled to the same deference shown to other non-party witnesses because . . . [they] are more likely willing to attend trial than other non-party witnesses."  *Pilevesky v. Suntrust Bank*, 2010 WL 4879006, at *3 (E.D.N.Y. Nov. 22, 2010); *Wistron Neweb*, 2022 WL 17067984, at *6.  Defendants also do not "explain how the witnesses would be inconvenienced by appearing in this Court."  *Soto v. Bey Transp. Co.*, 1997 WL 407247, at *3 (S.D.N.Y. July 21,

---

[20] Mr. Hermes' list appears to only include defense witnesses, as Plaintiff herself is not included on the list.  *Id.*

1997).  The factors pertaining to witness and party convenience thus weigh only somewhat in favor of transfer.

The remaining factors are generally neutral.

Unwilling witnesses in Texas cannot be subpoenaed to attend trial in the Southern District of New York unless they regularly transact business in New York in person.  Fed. R. Civ. P. 45(c)(1); *see Keawsri v. Ramen-Ya Inc.*, 2022 WL 2162981, at *2 (S.D.N.Y. May 5, 2022).  But "[n]othing has been presented to suggest that any of the non-party witnesses would be unwilling to testify" and [t]herefore, this factor does not enter the Court's analysis." *Soto*, 1997 WL 407247, at *4; *Cosa Xentaur Corp v. Bow*, 2014 WL 1331030, at *14 (E.D.N.Y. Mar. 31, 2014) (holding that the factor concerning availability of process is "inapplicable" where the party seeking transfer "does not allege that [the out-of-state witness] has indicated that he would be unwilling to testify in [the present forum] absent compulsion"); *Wistron Neweb*, 2022 WL 17067984, at *9 ("For this factor to have weight, . . . [the party seeking transfer] would have to show both that the [out-of-state witnesses] have relevant testimony and that they would be unwilling to testify without a subpoena.").

Mr. Hermes avers that "[a]ll relevant documents are located in Texas." *Id.* ¶¶ 23–24.  Not only is that representation wholly conclusory, it also does not appear to be true.  *Brown v. XGEN Pharms. DJB, Inc.*, 2023 WL 8372821, at *2 (E.D.N.Y. Dec. 4, 2023) ("[T]hese are conclusory, detail-less allegations[;] [t]hey simply lack any credibility without any details.").  For example, Plaintiff filed nine documents relevant to personal jurisdiction and diversity jurisdiction, including copies of her lease and New York utility bills, all of which are located in New York, not Texas.  Dkt. Nos. 38-1–38-9.  Ultimately, the location of relevant documents has negligible impact on the Court's analysis because "[t]he location of relevant documents is largely a neutral factor in today's

world of faxing, scanning, and emailing documents." *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007), *aff'd sub nom. N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010); *see also IKB Int'l S.A. v. Wilmington Tr. Co.*, 2017 WL 4084052, at *6 (S.D.N.Y. Sept. 14, 2017) ("[A]ccess to documents and other proof is not a persuasive factor in favor of transfer without proof that documents are particularly bulky or difficult to transport." (citation omitted)).

The locus of operative facts is diffuse. All of Plaintiff's claims arise out of her employment relationship with Defendants in which she worked—for the last three years—in New York while receiving direction and supervision from Texas. Many of Plaintiff's claims arise out of the Nonqualified Stock Option Grant Agreement. "In an action arising out of a contract, the location of the operative facts is 'where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred.'" *Eres N.V. v. Citgo Asphalt Ref. Co.*, 605 F. Supp. 2d 473, 481 (S.D.N.Y. 2009) (quoting *Oubre v. Clinical Supplies Mgmt., Inc.*, 2005 WL 3077654, at *4 (S.D.N.Y Nov. 17, 2005)). Here, the Option Agreement was negotiated and executed outside of New York,[21] was primarily performed by Plaintiff in New York, was to be performed by Defendant in Texas, and was breached in both fora. *See Oubre*, 2005 WL 3077654, at *4 (finding performance and breach occurred in both New York and North Dakota because "Oubre was to work for CSM in New York, while CSM's performance, paying Oubre and issuing him stock and stock options, would naturally take place at CSM's headquarters in North Dakota"); *Prudential Sec. Inc. v. Norcom Dev., Inc.*, 1998 WL 397889, at *5 (S.D.N.Y. July 16, 1998) (Chin,

---

[21] The Option Agreement was executed before Plaintiff moved to New York, while she was attending graduate school at Yale University in Connecticut. Dkt. No. 30 ¶¶ 43–44. The Option Agreement does not state the location of its execution and neither party has identified where it was negotiated or signed. Dkt No. 36-3.

J.) (performing similar analysis to determine that "the facts point to New York and North Carolina equally as the locus of this case").  With respect to Plaintiff's sexual harassment allegations, at least some of the allegedly harassing communications were directed to Plaintiff while she worked in New York. Dkt. No. 30 ¶¶ 69, 71–72.  It is unclear from the record from where those comments were made and where other incidents allegedly constituting harassment transpired, but Plaintiff does not suggest that they occurred in New York.  *E.g. id.* ¶¶ 69–72, 75–76.  This suggests that the locus of operative fact for such claims may lie outside New York.  *Tillery v. NYS Off. of Alcoholism & Substance Abuse Servs.*, 2013 WL 6405326, at *5 (S.D.N.Y. Dec. 5, 2013) ("Plaintiff argues that the alleged discrimination and retaliation she suffered affected her in the Southern District of New York; however, because her supervisors were located in Albany, the discriminatory acts occurred in Albany."); *Lapushner v. Admedus Ltd.*, 2020 WL 777332, at *5 (S.D.N.Y. Feb. 14, 2020) (holding this factor weighs in favor of transfer to Minnesota where "[a]lthough the impact of the alleged discrimination was partly felt in New York, most of the events from which Plaintiff's discrimination and harassment claims arise . . . originated or were made in the District of Minnesota").  However, Defendants have not established that such events transpired in the Northern District of Texas such that venue there would be more appropriate.

Defendants argue that in the interest of justice and judicial efficiency, the fact that the Texas Action was filed prior to the instant case warrants transfer to the Northern District of Texas. Dkt. No. 37 at 26–27.  "It is well established that the existence of a related action pending in the transferee court weighs heavily towards transfer."  *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 49 F. Supp. 2d 664, 668 (S.D.N.Y. 1999); *see Allied World Surplus Lines Ins. Co. v. Elamex USA, Corp.*, 2024 WL 2212948, at *9 (S.D.N.Y. May 16, 2024); *Moeller-Bertram v. Gemini Tr. Co., LLC*, 2024 WL 1860061, at *3 (S.D.N.Y. Apr. 29, 2024).  However, the Second Circuit has noted

that "a plaintiff should not be permitted to file a preemptive action in order to deprive the 'natural plaintiff' of its choice of forum" and thus has held that there is no presumption of transfer where "the first-filed lawsuit is an improper anticipatory declaratory judgment action." *Emps. Ins. of Wausau v. Fox Ent. Grp., Inc.*, 522 F.3d 271 n.4, 276 (2d Cir. 2008) (citation omitted); *Allied World*, 2024 WL 2212948, at *4. Here, Plaintiff sent Defendants a litigation hold letter on February 9, 2024, before either the Texas Action or the arbitration were filed. Dkt. No. 39-1. Defendants responded with litigation hold letters directed to Plaintiff on February 22 and 23, 2024. Dkt. No. 39-3. Plaintiff sent Defendants another litigation hold letter on February 24, 2024, requesting confirmation of compliance by no later than February 26, 2024. Dkt. Nos. 39-2, 39-3. About two weeks after this flurry of letters, Defendants filed the Texas Action seeking declaratory relief in the form of a judgment stating that Plaintiff was terminated for "cause" as defined in the Option Agreement, that her stock options were properly terminated, and that she does not possess equity in ClaimDeck. Dkt. No. 36-4 ¶¶ 61–83.[22] In the Texas Action, Defendants specifically identify the claims made in Plaintiff's litigation hold letter as, in part, the impetus for the suit. *Id.* ¶ 65.

"[I]f a declaratory action is filed as 'a means of gaining a procedural advantage and preempting the forum choice of the complainant in a coercive action, . . . the coercive suit is given precedence.'" *Cephalon, Inc. v. Travelers Co., Inc.*, 935 F. Supp. 2d 609, 613 (S.D.N.Y. 2013) (Sullivan, J.) (quoting *Reliance Ins. Co. v. Bend'N Stretch, Inc.*, 935 F.Supp. 476, 478 (S.D.N.Y. 1996)); *see also id.* at 614 ("Courts in this district have . . . routinely dismissed declaratory actions that were prompted by receipt of a notice letter."); *Peloton Interactive, Inc. v. Lululemon Athletica*

---

[22] The complaint in the Texas Action covers generally the same issues as the instant case (with the exception of Plaintiff's sexual harassment claims). *See generally*, *id.*

*Can. Inc.*, 2022 WL 4585812, at *2 (S.D.N.Y. Sept. 29, 2022).  In particular, where as here, the party seeking declaratory relief acknowledges that its suit was initiated partially or wholly in response to the opposing party's litigation hold letter, "courts routinely view such admissions as indicating an improper anticipatory motivation behind the action."  *Kule, LLC v. Alfwear, Inc.*, 2023 WL 8894000, at *5 (S.D.N.Y. Dec. 26, 2023); *see also Skiplagged, Inc. v. Sw. Airlines Co.*, 2022 WL 2391999, at *4 (S.D.N.Y. June 30, 2022) ("Skiplagged explicitly recognized in its Complaint that this case 'ar[ose] from Southwest's threat to sue Skiplagged.'"); *Cephalon, Inc.*, 935 F. Supp. 2d at 613–15 ("Travelers' clear statement of its 'intention to file suit' and Cephalon's admission that it acted on that threat are sufficient to render Cephalon's action improperly anticipatory."); *Crosman Corp. v. Heckler & Koch, Inc.*, 2008 WL 4347528, at *5 (W.D.N.Y. Sept. 17, 2008) ("Plaintiff obviously understood Defendant's threats of litigation as such, since it claims that it commenced this action 'to vindicate its rights in the face of [Defendant's] threats of injunctive relief, damages, and impoundment.'").  Defendants' decision to sue for exclusively declaratory relief because of their receipt of Plaintiff's litigation hold letter suggests that the Texas Action is an anticipatory declaratory judgment action that does not prompt application of the pro-transfer presumption of the first-filed rule.  *Allied World*, 2024 WL 2212948, at *5; *Starr Indem. & Liab. Co. v. Exist, Inc.*, 2023 WL 4029821, at *5 (S.D.N.Y. June 14, 2023), *aff'd*, 2024 WL 503729 (2d Cir. Feb. 9, 2024); *see also* (collecting cases).  Accordingly, Defendants' invocation of the first-filed rule is unavailing.

Finally, Defendants argue that the arbitration agreement should be treated as a forum-selection clause weighing in favor of transfer.  Dkt. No. 37 at 22–25.  Defendants argue that "the clause must be enforced unless the [Plaintiff] makes a 'sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid.'"  *Id.* at 23 (quoting

*Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014).  Plaintiff has made a sufficiently strong showing that the clause is "invalid" as applied to this case.  The EFAA applies and, pursuant to the EFAA, at Plaintiff's election, the arbitration agreement shall not be "valid or enforceable with respect to [the] case."  9 U.S.C. § 402(a); *Johnson*, 657 F. Supp. 3d at 558–61.

Even if the agreement was valid, it would not support transfer to the federal district court in Texas.  Forum selection clauses are enforced to protect "the parties' settled expectations" and to ensure that contractual terms to which the parties have agreed are honored.  *Atl. Marine*, 571 U.S. at 66.  The contractual term to which the parties agreed, however, was arbitration sited in Texas—it was not to a litigation sited in Texas.  And there is no reason to believe that parties who agreed to an arbitration sited in Texas would have agreed to a litigation sited in that forum.  Arbitration, of course involves different procedures than litigation.  As a general matter, it is generally shorter and more abbreviated, proceeds faster, and involves less time than litigation.  The choice of forum for a litigation dictates the jury that will hear the case, the location to which the parties presumptively will have to travel for what could be more protracted proceedings, the judge(s), and, where relevant, the principles of choice of law.  *See Cotton v. Slone*, 4 F.3d 176, 180 (2d Cir. 1993); *Camferdam v. Ernst & Young Int'l, Inc.*, 2004 WL 1124649, at *2 (S.D.N.Y. May 19, 2004) (holding that "there is no statutory right to a jury because the [FAA] provides for a jury trial only in actions to compel arbitration").  It is easy to imagine why an employee located in New York might, as part of a contractual bargain, agree to an arbitration in Texas without agreeing to a Texas litigation.  It would do nothing to honor the parties' settled expectations to require them to litigate in Texas when the only agreement they reached was to arbitrate in Texas.  Defendants' request that the Court transfer the case to the Northern District of Texas is denied.

## IV.    SUFFICIENCY OF PLAINTIFF'S CLAIMS

### A.    Sexual Harassment

Plaintiff brings two sexual harassment claims against all Defendants: one under the NYCHRL and one under the NYSHRL.  Dkt. No. 30 ¶¶ 77–86.  For Plaintiff's NYSHRL claim to survive, she must plead that she was subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more . . . protected categories." *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 453 (S.D.N.Y. 2024) (citation omitted). Meanwhile, under the NYCHRL, Plaintiff must plead that she was "treated less well than other employees because of her gender." *Id.* at 453 (quoting *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 66 (S.D.N.Y. 2020)).  Neither the NYSHRL nor NYCHRL is "a general civility code," and a claim may not be based only upon "petty slights or trivial inconveniences." *Mercado v. Mount Sinai Beth Israel*, 2023 WL 5975322, at *12 (S.D.N.Y. Sept. 14, 2023).  Because the NYSHRL imposes a standard below which the NYCHRL may not fall, "if a claim is viable under the NYSHRL, it is as a matter of law viable under the NYCHRL, and there is no need for further inquiry." *Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 48 (S.D.N.Y. 2009) (citing *Brightman v. Prison Health Servs., Inc.*, 878 N.Y.S.2d 357, 358 (1st Dep't 2009)).

Defendants argue that Plaintiff fails to state a legally sufficient claim of sexual harassment under either the NYSHRL or NYCHRL because (1) Plaintiff's allegations are conclusory and vague and fail to establish that Plaintiff was treated less well because of her sex or gender, (2) Plaintiff's sexual harassment allegations are untimely, (3) Plaintiff fails to show that the impact of the harassment was felt in New York City or State, and (4) Plaintiff fails to state a claim as to the individual defendants.  Dkt. No. 37 at 29–33.

The complaint contains several paragraphs of conduct alleged to constitute sexual harassment.  Plaintiff alleges that she was "directed by Dwayne and Andrea Hermes to flirt and

even become romantically involved with ClaimDeck clients, potential clients and partners" including while she worked remotely in New York. Dkt. No. 30 ¶¶ 4, 69–71. Mr. Hermes "fixated on [Plaintiff's] appearance" by "directing her to 'fix' her makeup and accusing her of looking 'tired' in front of other ClaimDeck and Hermes Law employees while on remote calls from her New York workspace." *Id.* ¶ 72. Mr. Hermes "did not fixate on the appearance of male employees." *Id.* ¶ 74. In or about 2017, Mr. Hermes "jumped onto a scooter that [Plaintiff] was about to ride, sliding behind her in a compromising position" while "a colleague took pictures." *Id.* ¶ 75. Finally, in or about November 2023, Mr. Hermes "compared [Plaintiff] to a piece of steak," at a business dinner otherwise attended exclusively by men. *Id.* ¶¶ 4, 76.

First, Defendants argue that Plaintiff's allegations of sexual harassment are "conclusory and vague" and that Plaintiff fails to "allege facts that explain how [the] alleged comments relate to Plaintiff's sex or gender." Dkt. No. 37 at 32. On a motion to dismiss "[a] court must first ignore 'mere conclusory statements' or legal conclusions, which are not entitled to the presumption of truth." *Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012) (summary order) (quoting *Iqbal*, 556 U.S. at 678). Certain of Plaintiff's allegations are too conclusory to be credited on the motion to dismiss. *E.g.* Dkt. No. 30 ¶¶ 4 (Plaintiff "was sexually harassed while working for Defendants"), 68 (Plaintiff "was subjected to sexual harassment"), 75 (Mr. Hermes "humiliated [Plaintiff] sexually"); *cf. Lettieri v. Anti-Defamation League Found.*, 2023 WL 5152447, at *6 (S.D.N.Y. Aug. 10, 2023) (disregarding allegations that defendant "treated Plaintiff less well" or that defendant "discriminated against [her]" as conclusory).

Even among Plaintiff's non-conclusory allegations, many are too vague or disconnected to Plaintiff's gender to, in isolation, support an inference that Plaintiff was treated less well because of her gender. Under the NYCHRL and NYSHRL, "generalized hostility or generally uncivilized

behavior is not actionable." *Lettieri*, 2023 WL 5152447, at *7.  "[T]he defendant's offending conduct must have been keyed to a protected characteristic of the plaintiff." *Id.*  For example, Plaintiff does not allege sufficient facts to infer that Mr. Hermes' comment comparing her to a piece of steak was gender-motivated.   Though objectifying comments may be plausibly degradative, they are not inherently gendered.  *See, e.g.*, *United States v. Ballard*, 727 F. App'x 6, 9 (2d Cir. 2018) (finding "prosecution's repeated characterization of [criminal defendant's] treatment of the minor victims as 'pieces of meat'" to be "strong rhetoric" but not improper); *United States v. Salameh*, 54 F. Supp. 2d 236, 272 n.50 (S.D.N.Y. 1999) (noting comments describing torture of a man wherein he was "kept naked in a freezing room, hanging like a piece of meat"), *aff'd*, 16 F. App'x 73 (2d Cir. 2001).  Similarly, Plaintiff does not allege what about Mr. Hermes' conduct in sliding behind her on a scooter was sex-motivated.  She does not allege that he touched her in doing so or explain what about the position was "compromising."  *Cf. Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 179 (2d Cir. 2012).  Mere unwanted proximity will not necessarily rise to the level of sexual harassment.  *See, e.g.*, *Lonergan-Milligan v. N.Y. State Off. of Mental Health*, 2018 WL 6605686, at *2, 5 (W.D.N.Y. Dec. 17, 2018) (holding that where individual malingered at plaintiff's work station, stood behind plaintiff making grunting and growling noises, and sat in plaintiff's seat, such conduct was not necessarily due to plaintiff's gender).

"While facially neutral incidents may be considered among the totality of the circumstances in any hostile work environment claim, there must be a circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (citations and alterations omitted); *see Ford v. N.Y.C. Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377,

389 (S.D.N.Y. 2008) (Chin, J.) (comments that are "disrespectful and rude . . . but are not objectively indicative of gender animus" will not, on their own, support a claim of hostile work environment), *aff'd sub nom. Ford v. N.Y.C. Dep't of Health & Mental Hygiene*, 352 F. App'x 471 (2d Cir. 2009); *Figueroa v. City of New York*, 118 F. App'x 524, 526 (2d Cir. 2004) (summary order); *Kamrowski v. Morrison Mgmt. Specialist*, 2010 WL 3932354, at *14 (S.D.N.Y. Sept. 29, 2010); *Smith v. City of New York*, 2018 WL 3392872, at *9 (S.D.N.Y. July 12, 2018).  Plaintiff does not allege any circumstantial or other basis for inferring that these gender-neutral incidents were in fact sex-motivated.  Viewed on their own, those gender-neutral allegations are insufficient to support an inference that Plaintiff was subjected to a sex-based hostile work environment.

Plaintiff's remaining allegations—that Mr. Hermes commented negatively on her appearance but did not focus on male employees' appearances, and that he and Ms. Hermes encouraged Plaintiff to use her appearance, flirt, or become romantically involved with potential clients or certain individuals in the industry—do support an inference that Plaintiff was subjected to inferior working conditions on account of her sex.  *See, e.g.*, *Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 416 (S.D.N.Y. 2017) (sustaining claim for sexual harassment because allegations that defendant made "remarks about Plaintiff's appearance and using her femininity to successfully carry out certain job responsibilities, create[] a minimal inference that Plaintiff was subject to differential treatment on the basis of her gender"); *Regan*, 2012 WL 692056, at *10 (denying motion to dismiss claim for gender discrimination where plaintiff alleged "management expected her to flirt with clients and prospective clients" and "male co-workers regularly commented on her appearance"); *Rodriguez*, 2014 WL 1347369, at *2 (recommending denial of motion to dismiss for failure to state a claim for sexual harassment where plaintiff alleged that defendant instructed plaintiff on her appearance and told her "to flirt with male customers in order to generate more

sales"); *Johnson*, 657 F. Supp. 3d at 554 (holding plaintiff pleaded claim for sexual harassment where he alleged the CEO pressured him to "have sex with colleagues, including herself, or with clients"). This is sufficient to state a claim under both the NYCHRL and NYSHRL. Dismissal is therefore not warranted on this basis.

Second, Defendants argue that "most of Plaintiff's sexual harassment claims are undated and untimely, and therefore must be dismissed" pursuant to "the three year statute of limitations under the NYSHRL or NYCHRL." Dkt. No. 37 at 30; *see also Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) ("The NYSHRL and NYCHRL statutes of limitations are three years."). "[B]ecause the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013); *accord Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). "For a court to dismiss a complaint based on the statute of limitations, the plaintiff must 'plead[ ] itself out of court.'" *Ashley v. Eastchester Police Dep't*, 2012 WL 234399, at *2 (S.D.N.Y. Jan. 6, 2012) (quoting *In re marchFIRST Inc.*, 589 F.3d 901, 905 (7th Cir. 2009)).

In light of the undated claims, it is not apparent from the face of the complaint that three years have elapsed since the alleged harassment. *See Fargas*, 986 F. Supp. 2d at 427 (denying motion to dismiss claims as untimely because "there is no evidence before the Court regarding the dates of the relevant tenders of delivery, and the Court cannot dismiss the breach of warranty claim based on the statute of limitations"); *Taylor*, 207 F. Supp. 3d at 300 ("For the claims that are timely and those that are undated, the Court will consider whether they state a claim on the merits.");

*Bonterre v. City of New York*, 2021 WL 4060358, at *4 (S.D.N.Y. Sept. 7, 2021) (similar).[23]  The

statutes of limitations therefore do not warrant dismissal on the pleadings.  "Defendants may, of

course, re-assert this defense in a properly supported motion under Rule 56 of the Federal Rules

of Civil Procedure."  *Drees v. Cnty. of Suffolk*, 2007 WL 1875623, at *9 (E.D.N.Y. June 27, 2007)

(Bianco, J.) (citation omitted).

    Third, Defendants argue that Plaintiff's claims for sexual harassment under the NYCHRL

and NYSHRL should be dismissed because "Plaintiff has not pleaded sufficient facts to support

her . . . theory that the impact of the asserted sexual harassment was felt in New York City, let

alone in New York State."  Dkt. No. 37 at 29.  The protections of the NYCHRL "are afforded only

to those who inhabit or are 'persons in' the City of New York."  *Hoffman v. Parade Publ'ns*, 933

N.E.2d 744, 746 (N.Y. 2010) (citing N.Y.C. Admin. Code. § 8-101).  The NYSHRL is similarly

constructed to "protect 'inhabitants' and persons 'within' the state, meaning that those who work

in New York fall within the class of persons who may bring discrimination claims in New York."

*Id.* at 747.  In *Hoffman*, the New York Court of Appeals limited the territorial jurisdiction of the

---

[23] Even if certain conduct occurred more than three years prior to filing, "[u]nder [the continuing violation] doctrine, 'if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"  *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (quoting *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992)); *see also Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("The continuing violation doctrine provides that when a plaintiff experiences a continuous practice and policy that violates his or her rights, the commencement of the statute of limitations period may be delayed until the last violation." (citation and alterations omitted)).  The continuing violation doctrine is invoked in the context of timeliness and "allows courts to consider conduct that would ordinarily be time barred as long as the untimely incidents represent an ongoing unlawful employment practice."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 107 (2002) (citation omitted).  A hostile work environment claim is generally considered a paradigmatic continuing violation because the claim's "very nature involves repeated conduct."  *Id.* at 115.  "It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Id.* However, the Court need not determine application of the continuing violation doctrine at this time because no statute of limitations defense appears on the face of the complaint.

NYCHRL and the NYSHRL by non-resident plaintiffs to cases where discriminatory conduct had an impact within New York City and New York State respectively. *See id.* at 746–47; *Rinaldi v. Nice, Ltd.*, 2021 WL 827767, at *8 (S.D.N.Y. Mar. 4, 2021), *aff'd sub nom. Rinaldi v. Mills*, 2022 WL 17480081 (2d Cir. Dec. 7, 2022). Although the language in *Hoffman* is limited to the statutes' application to non-residents, "districts courts applying *Hoffman* have consistently rejected NYCHRL claims brought by City residents who worked elsewhere, holding that the location of the plaintiff's workplace is where the impact of discriminatory conduct occurred." *Murray v. Brag Sales Inc.*, 2024 WL 4635479, at *2 (S.D.N.Y. Oct. 31, 2024) (citation omitted) (collecting cases); *accord Mejia v. White Plains Self Storage Corp.*, 2020 WL 247995, at *4 (S.D.N.Y. Jan. 16, 2020) (collecting cases); *Hardwick v. Auriemma*, 983 N.Y.S.2d 509, 511 (1st Dep't 2014).

"[W]here the alleged discriminatory act takes place outside of New York City, the relevant location of the injury for purposes of the impact analysis is not the Plaintiff's residence, but the Plaintiff's place of employment." *Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 625 (E.D.N.Y. 2012); *accord Murray*, 2024 WL 4635479, at *2; *Huan Wang v. Air China Ltd.*, 2020 WL 1140458, at *17 (E.D.N.Y. Mar. 9, 2020); *see also Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 354 (N.Y. 2024) (noting that *Hoffman* "sets forth two ways in which a nonresident may satisfy the impact requirement: (1) *working in New York* or (2) establishing that the challenged conduct had some impact on the plaintiff within the respective New York geographic boundaries." (emphasis added)). Here, Plaintiff's alleged place of employment is New York City, thus satisfying the impact requirement. Dkt. No. 30 ¶ 44. Plaintiff additionally alleges that the impact of the harassment was felt in New York when Mr. and Ms. Hermes encouraged Plaintiff "to flirt to attract potential clients or use her appearance to attract business, often while she worked remotely in New York," *id.* ¶ 69, and when Mr. Hermes directed Plaintiff to "fix" her makeup and accused her of

"looking 'tired' in front of other ClaimDeck and Hermes Law employees while on remote calls from her New York workspace," *id.* ¶ 72. Plaintiff has satisfied the local impact requirement.

Fourth, Defendants argue that Mr. Hermes is not an employer within the meaning of the NYSHRL. Dkt. No. 37 at 32–33.[24] "Under a recent decision by the New York Court of Appeals, a corporate employee – even its owner and CEO – no longer qualifies as an 'employer'" under the NYSHRL. *Bueno v. Eurostars Hotel Co., S.L.*, 2022 WL 95026, at *7 (S.D.N.Y. Jan. 10, 2022) (citing *Doe v. Bloomberg, L.P.*, 167 N.E.3d 454, 459–61 (N.Y. 2021). In *Bloomberg, L.P.*, the New York Court of Appeals held that the NYSHRL "does not render employees liable as individual employers" but nonetheless left open a path to individual liability for aiding-and-abetting NYSHRL violations. 167 N.E.3d at 453 n.1, 459 (citing *Patrowich v. Chem. Bank*, 473 N.E.2d 11 (N.Y. 1984)); *see also Kiseleva v. Greenspan*, 2024 WL 4635463, at *9 (S.D.N.Y. Oct. 31, 2024) ("An employee may be held liable under the NYSHRL only under an aiding and abetting theory."); *Baptiste v. City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023) (holding that individual defendant "cannot be held individually liable under the NYSHRL" and "can be held liable under the state statute only on an aider-and-abettor theory"); *Bueno*, 2022 WL 95026, at *7 (holding that individual defendant does not qualify as an employer but is not immune from liability because "under the NYSHRL, individual employees may be liable for aiding and abetting discriminatory conduct").

Although Plaintiff pleads a claim for primary liability against Mr. Hermes, rather than secondary aiding-and-abetting liability pursuant to N.Y. Exec. Law § 296(6), "the failure of a complaint to cite a statute (or in this case a subsection of the statute) in no way affects the merits

---

[24] Defendants make a similar argument with respect to Ms. Hermes, whom the Court has already dismissed for lack of personal jurisdiction. *Id.*

of the claim." *Hicks v. IBM*, 44 F. Supp. 2d 593, 600 n.4 (S.D.N.Y. 1999) (citing *Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) ("Factual allegations alone are what matters.")). Even where a plaintiff "does not use verbs such as 'aid,' 'abet,' 'compel,' or 'incite' in the complaint," the Court looks to the factual allegations to see whether she has pled that theory of liability. *McIlwain v. Korbean Int'l Inv. Corp.*, 896 F. Supp. 1373, 1383 (S.D.N.Y. 1995); *see Miotto v. Yonkers Pub. Sch.*, 534 F. Supp. 2d 422, 429 (S.D.N.Y. 2008) ("Since we agree that plaintiff has sufficiently pled that defendants aided or abetted [defendant], there is no need to amend the Complaint to add those words."). The Court thus looks to whether Plaintiff has stated a claim against Mr. Hermes for aiding and abetting the harassment to which she was allegedly subjected. She has.

"[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim." *Rojas*, 660 F.3d at 107 n.10 (citation omitted). "The bar for pleading 'actual participation' at the motion to dismiss stage is low." *Robinson v. MSG Ent. Grp., LLC*, 2024 WL 3938361, at *16 (S.D.N.Y. Aug. 26, 2024). Plaintiff alleges that Mr. Hermes directly participated in the conduct giving rise to the hostile work environment claims as he is the principal individual charged with commenting negatively on her appearance and—along with Ms. Hermes—repeatedly encouraging her to flirt with potential clients on the business' behalf. Dkt. No. 30 ¶¶ 69–71. These allegations of Mr. Hermes' actual participation are sufficient. *See Lee v. Riverbay Corp.*, 2024 WL 4312166, at *16 (S.D.N.Y. Sept. 27, 2024) ("As each of the Individual Defendants . . . participated in the discriminatory comments that gave rise to liability under the disparate treatment and hostile work environment claims, . . . the claims against the Individual Defendants for aiding and abetting disparate treatment and hostile work environment discrimination . . . may move forward.");

*Colbert v. FSA Store, Inc.*, 2020 WL 1989404, at *5 (S.D.N.Y. Apr. 27, 2020); *Attali v. City of New York*, 2018 WL 11476391, at *3–4 (S.D.N.Y. Sept. 17, 2018).

Defendants' motion to dismiss is denied as to Plaintiff's first and second causes of action for sexual harassment under the NYCHRL and NYSHRL.

### B.    Breach of Contract

Plaintiff next brings a claim for breach of contract under Delaware law. Dkt. No. 30 ¶¶ 87–90. She states that Defendants intentionally "manufactured fictitious grounds for terminating Plaintiff's employment . . . to deprive Plaintiff of her vested equity." *Id.* ¶¶ 88–90.

Under Delaware law, "[i]n order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *accord Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024) ("The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy."); *Kuramo Cap. Mgmt., LLC v. Seruma*, 2024 WL 1888216, at *29 (Del. Ch. Apr. 30, 2024) (same). Defendants do not dispute the first or third element and instead argue that "Plaintiff has not pleaded any breach." Dkt. No. 37 at 33–34.

Delaware law, New York law, and the *Twombly–Iqbal* standard of federal pleading "require a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015); *see Enzolytics, Inc. v. Empire Stock Transfer Inc.*, 2023 WL 2543952, at *3 (Del. Ch. Mar. 16, 2023) ("At the pleading stage of a written contract dispute, Rule 8 requires the plaintiff to take the basic and customary step of producing the agreement and citing to the provisions alleged to

have been breached."); *Erisman v. Zaitsev*, 2021 WL 6134034, at \*11 (Del. Ch. Dec. 29, 2021).

"[A] breach of contract claim will be dismissed where a plaintiff fails to allege 'the essential terms

of the parties' purported contract, including the specific provisions of the contract upon which

liability is predicated.'" *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, N.A.*, 2023

WL 6812984, at \*5 (S.D.N.Y. Oct. 16, 2023) (quoting *Fink v. Time Warner Cable*, 810 F. Supp.

2d 633, 644–45 (S.D.N.Y. 2011)); *see also Spencer-Smith v. Ehrlich*, 2024 WL 709291, at \*12

(S.D.N.Y. Feb. 21, 2024) (collecting cases).  Plaintiff has not discharged this duty, and her claim

for breach of contract must therefore be dismissed.

Furthermore, although Plaintiff appears to take umbrage with the classification of her

termination as "for cause," she does not plead any facts giving rise to the inferences that

Defendants "lacked cause to terminate [her] or [Defendants] mischaracterized the termination."

*Buck v. Viking Holding Mgmt. Co. LLC*, 2021 WL 673459, at \*4 (Del. Super. Ct. Feb. 22, 2021).

"Simply disagreeing with [Defendants'] [c]ause characterization in a conclusory fashion—without

proffering facts suggesting the characterization actionably is incorrect—does not state a claim for

breach of contract." *Id.* at \*3.  Plaintiff's brief in opposition to Defendants' omnibus motion states

that she "pleads facts about her job performance that contradict each of the reasons she was

allegedly fired for cause.  Dkt. No. 40 at 35 (citing Dkt. No. 30 ¶¶ 58–62).  But although those

paragraphs of the complaint allege that Plaintiff received fulsome performance reviews and

professional feedback, the Court cannot determine whether they "contradict each of the reasons

she was allegedly fired for cause" because Plaintiff does not actually allege any of the reasons she

was fired for cause.  Plaintiff therefore fails to plead breach of any of the express provisions of the

Option Agreement.

Plaintiff also appears to bring her contract claim as a breach of the implied covenant of good faith and fair dealing. *See* Dkt. No. 30 ¶ 90.[25] "Under Delaware law, '[t]he implied covenant [of good faith and fair dealing] is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 123–24 (2d Cir. 2022) (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)). "The implied covenant 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'" *Id.* (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)). The implied covenant applies when "the express terms of the agreement can be reasonably read to imply certain other conditions, or leave a gap, that would prescribe certain conduct, because it is necessary to vindicate the apparent intentions and reasonable expectations of the parties." *Dieckman*, 155 A.3d at 367. "[P]arties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442. To sufficiently plead breach of the implied covenant of good faith and fair dealing under Delaware law, a complaint must allege (1) a specific implied contractual obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the plaintiff. *See Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020).

---

[25] Although the claim is set forth under the heading "Breach of Contract" rather than "Breach of the Implied Covenant of Good Faith and Fair Dealing," the Court looks to the substance of the claim and construes the pleading so as to do justice. *See Henry v. Wyeth Pharms., Inc.*, 2007 WL 4526525, at *6 (S.D.N.Y. Dec. 19, 2007). Rule 8 provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8. "If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *Id.*

"The application of the [implied] [c]ovenant is particularly delicate when an employee in an 'at-will' employment relationship with his employer seeks to invoke the [implied] [c]ovenant to state a claim for wrongful termination." *Smith v. Scott*, 2021 WL 1592463, at *7 (Del. Ch. Apr. 23, 2021). The Delaware Supreme Court has noted that "[c]ourts have been reluctant to recognize a broad application of the [implied covenant of good faith and fair dealing] out of a concern that the [c]ovenant could thereby swallow the [d]octrine and effectively end at-will employment." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442 (Del. 1996); *see id.* at 441(holding that the implied covenant "limits at-will employment only in very narrowly defined categories"). In *Pressman*, the Delaware Supreme Court recognized one such narrow exception for incidents in which "the employer manifest[ed] bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to create fictitious grounds to terminate employment." *Id.*; *see Schatzman v. Mod. Controls, Inc.*, 2024 WL 4249939, at *3 (Del. Super. Ct. Sept. 20, 2024). "[S]ubsequent applications of *Pressman* have clarified that actual falsification of documents to justify a termination decision is not required to sustain a claim that the employer breached the [implied] [c]ovenant by manufacturing a basis to terminate for cause." *Smith*, 2021 WL 1592463, at *7 n.80 (citing *Lawver v. Christiana Care Health Sys., Inc.*, 2017 WL 1167321, at *4 (Del. Super. Ct. Feb. 21, 2017)).

Plaintiff cites three cases in support of her argument that she need only plead that her termination was prompted by Defendants' desire to prevent her from exercising her right to purchase her options to state a claim for breach of the implied covenant of good faith and fair dealing. *See* Dkt. No. 40 at 35 (citing *Pressman*, 679 A.2d at 444; *Smith*, 2021 WL 1592463, at *8; *Sheehan*, 2020 WL 2838575, at *11). However, each of those cases is readily distinguishable on their facts. In *Pressman*, the plaintiff alleged that his former supervisor "set out on a campaign

to discredit Pressman by creating fictitious negative information about Pressman's work and hiding positive information" and then "[b]ased on the distorted record he created, [the supervisor] went to his superiors and caused Pressman to be terminated" after which the employer was made aware of the supervisor's conduct and ratified those deceitful acts. *Pressman*, 679 A.2d at 444. In *Smith*, the court held that "Smith has well pled that the reasons given for termination were false and were intended to mask the Defendants' design to seize Smith's Vested Interests." *Smith*, 2021 WL 1592463, at *7. Smith alleged that he was told that the termination was due to his "habitual failure to dedicate a sufficient portion of [his] business time to performing [his] job duties" leading to "over $30 million in project cost overruns" but that those charges were false and the defendants' "sole motivation was to take his Vested Interests without compensation." *Id.* at *4, *7. Finally, in *Sheehan*, the court wrote that "[t]he Sheehans have pleaded that [defendant] purposefully manufactured 'cause' for the termination in order to oust the Sheehans from [the company] and deprive the Sheehans from receiving any benefit." *Sheehan*, 2020 WL 2838575, at *10 (punctuation omitted). The *Sheehan* court also held that "the Sheehans must prove at trial that [defendant] exercised its discretion in bad faith" *id.* at *11, which comported with the fact that the provisions in the contract setting forth the permissible grounds for termination with cause included subjective bases that required the defendant to exercise its discretion, *see id.* at *11 (stating that for-cause termination could be based on "conduct which could reasonably be expected to bring the Company or any of its affiliates into public disgrace or disrepute"). Here, Plaintiff has not alleged that Defendants' for-cause determination was based on false or manipulated records or was based on discretionary assessments undertaken in bad faith. Plaintiff thus fails to identify any contractual gap where Defendants were required to act in good faith but did not. *See Dieckman*, 155 A.3d at 367.

If Defendants fired Plaintiff for cause but Plaintiff had not, in fact, engaged in conduct properly giving rise to a finding of cause, then Plaintiff's claim would be for breach of contract and Plaintiff would have to identify the specific contractual provision that disallowed Defendants' classification. *See Buck*, 2021 WL 673459, at *3; *Sheehan*, 2020 WL 2838575, at *10. To plead a claim for implied breach of contract under Delaware law, however, Plaintiff must allege either that Defendants manufactured circumstances such that Plaintiff could be fired for cause or that the contract permitted Defendants to utilize their discretion in finding cause for termination and Defendants impermissibly acted with bad faith in so doing. *See, e.g.*, *Lawver*, 2017 WL 1167321, at *6 ("Lawver alleges that the event precipitating her termination—a delay in rooming patients—was caused by factors outside of her control and not by her failure to follow workflow procedures. The reasonable inference from this allegation is that the true cause of the delay was known to Lawver's superiors, who then falsely attributed fault to Lawver in order to manufacture her termination."); *Schatzman*, 2024 WL 4249939, at *11 ("[I]t is reasonable to infer that the record leading to [plaintiff's] termination was falsified or manipulated" where the plaintiff was fired based on allegedly false accusations of harassment and defamation and he "was given no information about the accusations against him, was never invited to participate in the investigation, and was never granted a forum in which to defend himself before his employment was terminated."). And she must allege facts to support those conclusions. Simply having adverse interests while making the for-cause determination is not enough. *See Pressman*, 679 A.2d at 444 ("Dislike, hatred or ill will, alone, cannot be the basis for a cause of action for termination of an at-will employment.").

Defendants' motion to dismiss Plaintiff's breach-of-contract claim is granted.

### C.    Conversion

Plaintiff brings a claim for conversion under Delaware law.  Dkt. No. 30 ¶¶ 106–109. Paralleling her contract claim, she alleges that "Defendants, using deceit and misrepresentation, manufactured fictitious grounds to terminate [Plaintiff's] employment" and that "Defendants did so intentionally to deprive [Plaintiff] of her vested equity."  *Id.* ¶¶ 107–108; *see also* Dkt. No. 40 at 36 n.13 (citing *Tansey v. Trade Show News Networks, Inc.*, 2001 WL 1526306, at *1 (Del. Ch. Nov. 27, 2001)).  Defendants argue that Plaintiff's conversion claim should be dismissed because (1) it is duplicative of her contract claim; (2) Plaintiff did not demand the return of the options; and (3) Plaintiff's claim is a claim for money.  Dkt. No. 37 at 38–40.

"Conversion is 'any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it.'"  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)). "A plaintiff states a viable claim for conversion where he alleges (1) he had a property interest in equipment or other property; (2) he had a right to possession of the property; and (3) the property was converted, in that the defendants wrongfully possess or disposed of the property as if it were their own."  *Malca v. Rappi, Inc.*, 2021 WL 2044268, at *5 (Del. Ch. May 20, 2021) (citing *Israel Disc. Bank of N.Y. v. First State Depository Co., LLC*, 2013 WL 2326875, at *19 (Del. Ch. May 29, 2013)).

Because "[i]t is well settled under Delaware law that a plaintiff cannot bring a claim of conversion arising solely out of a breach of contract claim," courts will dismiss an otherwise viable conversion claim where it duplicates the claim for breach of contract.  *Sheehan*, 2020 WL 2838575, at *14; *see AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *25 (Del. Ch. Apr. 14, 2022) ("Plaintiffs would prevail on their claim for conversion for the same reason that they prevailed on

their claim for breach [of contract]. Somewhat ironically, however, this is fatal to their conversion claim.").

However, Delaware courts have "declined to dismiss conversion claims as duplicative of breach of contract claims where the remedies for either claim would differ." *AlixPartners*, 2022 WL 1111404, at \*24 & n.210. In *Smith*, the court sustained a conversion claim based on the defendants' seizure of the plaintiff's vested interests pursuant to an allegedly manufactured termination for cause. *Smith*, 2021 WL 1592463, at \*11. The *Smith* court held that "[w]hile it is true the propriety of the forfeiture turns on contractual rights and obligations, and in this sense the conversion claim overlaps with the breach of contract claim," the remedies Plaintiff sought differed for each claim. *Id.* The *Smith* plaintiffs sought a "traditional remedy for a conversion—the value of the property at the time of the conversion, with interest." *Id.* (citations omitted). However, if the *Smith* plaintiffs proceeded only under a breach of contract theory, that remedy would be potentially unavailable as plaintiff might be able to recover only expectation damages in the form of specific performance (*i.e.* reinstatement of the plaintiffs' vested equity). *See id.*; *see also id.* at \*15–16 (explaining that a "buyout" of plaintiffs' vested interests may not "fit[] within the realm of expectation damages"). Plaintiff's claim follows this pattern as she seeks "the full cash value of the vested equity she has been denied" as relief for her conversion claim, Dkt. No. 30 ¶ 109, and "[s]pecific performance of her contract" as relief for her contract claim, *id.* at 17. Defendants do not argue that Plaintiff could obtain the same relief under both claims and instead cite two cases in which the same relief *was* available. Dkt. No. 46 at 24 (citing *Sheehan*, 2020 WL 2838575, at \*14; *Kim v. Coupang, LLC*, 2021 WL 3671136, at \*7 (Del. Ch. Aug. 19, 2021)). Plaintiff's conversion claim thus need not be dismissed as duplicative.

Defendants next argue that "[p]rior to 'bringing an action for conversion, a plaintiff must demonstrate that it made a demand that the property be returned and the defendant refused the demand.'" Dkt. No. 37 at 38 (citing *Malca*, 2021 WL 2044268, at *5). Defendants' cited case clarifies that "[t]his requirement is excused, however, when the alleged wrongful act amounts to a denial of the rights of the real owner." *Malca*, 2021 WL 2044268, at *5 (citing *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *24 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010)). Defendants' alleged wrongful act is terminating Plaintiff for cause such that she was denied her vested equity under the Option Agreement. Dkt. No. 30 ¶¶ 107–108. That constitutes a denial that Plaintiff continued to have any possessory rights over the options and thus excuses the requirement that she demand return of the equity. *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *23 (Del. Ch. Mar. 5, 2014) ("Because White's actions amount to a denial of Wayman's ownership rights in the files, Wayman was excused from demanding their return before initiating this action.").

Defendants finally argue that "to the extent Plaintiff's claim for conversion is for the conversion of money it must be dismissed because '[g]enerally, an action in conversion will not lie to enforce a claim for the payment of money.'" Dkt. No. 37 at 39–40 (quoting *Kuroda*, 971 A.2d at 890) (citing *Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *11 (Del. Ch. June 29, 2020) (subsequent history omitted))). Plaintiff's claim for conversion is not for the conversion of money but rather of her options, and Delaware courts have sustained conversion claims based on misappropriated equity interests. *See, e.g.*, *Smith*, 2021 WL 1592463, at *11; *Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218, at *19–20 (Del. Super. Ct. May 30, 2008); *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch.), *aff'd*, 620 A.2d 856 (Del. 1992); *see also Drug*, 168 A. at 93 (noting that the common law rule that "shares of stock in a corporation

could not be the subject of conversion . . . [has] been generally repudiated by the more modern decisions") (collecting cases).

Defendants' motion to dismiss Plaintiff's claim for conversion is denied.

### D.    Tortious Interference

Plaintiff alleges that Hermes Law and Mr. Hermes tortiously interfered with the Option Agreement.  Dkt. No. 30 ¶¶ 96–105.  Under Delaware law, the elements of a claim for tortious interference with a contract are: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."  *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (citation omitted).[26]  "Imposition of liability for tortious interference with contractual relationship requires that the defendant be a stranger to both the contract and the business relationship giving rise to and underpinning the contract."  *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007) (citation omitted); *see also id.* ("After all, [a] defendant cannot interfere with its own contract." (citations omitted)).

It is axiomatic that "[t]o state a tortious interference claim, a plaintiff must properly allege an underlying breach of contract."  *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006); *see Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *11 (Del. Ch. Sept. 22, 2016) ("A party cannot claim a tortious interference with contract when there has been no breach of that contract."); *Aspen Advisors LLC v. United Artists*

---

[26] Both parties argue Delaware law applies.  Dkt. No. 30 at 15; Dkt. No. 37 at 35–38; Dkt. No. 40 at 32–34; Dkt. No. 46 at 21–24.  The Court will accordingly evaluate the tortious interference claim under Delaware law.  *See Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" (quoting *Tehran-Berkeley Civil & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989))); *Pac. Indem. Co. v. Kiton Corp.*, 2022 WL 4237092, at *2 (S.D.N.Y. Sept. 14, 2022).

*Theatre Co.*, 843 A.2d 697, 713 (Del. Ch. 2004) ("Because the plaintiffs have failed to state a claim for breach of either § 2(c) or the implied covenant of good faith and fair dealing in the Warrants, their additional claim that the defendants . . . tortiously interfered with the . . . contract necessarily fails as well."), *aff'd*, 861 A.2d 1251 (Del. 2004); *Goldman*, 2002 WL 1358760, at *4 (Del. Ch. 2002) ("A claim of tortious interference with a contractual right requires [among other things] . . . a contract, a breach of that contract, and an injury.").  Because Plaintiff has not stated a legally sufficient breach of contract claim, her claim for tortious interference of contract also must be dismissed.

Defendants argue that even if Plaintiff did sufficiently plead an underlying breach of contract claim, her tortious interference claim would still fail as to Mr. Hermes because Plaintiff does not show that Mr. Hermes is a stranger to the contract such that he could be liable for tortiously interfering with it, and as to Hermes Law because Hermes Law is entitled to the affiliate privilege.  Dkt. No. 37 at 35–38.

According to Defendants, "the tortious interference claim must be dismissed as to [Mr.] Hermes because he was a party to the contract allegedly interfered with." *Id.* at 35.  Although Defendants argue that "the contract at issue was between Plaintiff and [Mr.] Hermes," Dkt. No. 37 at 35, Mr. Hermes merely signed the Option Agreement on ClaimDeck's behalf as Chief Executive Officer ("CEO") of ClaimDeck, and is not personally bound by the contract, Dkt. No. 36-3 at 6. *See USH Ventures v. Glob. Telesystems Grp., Inc.*, 1998 WL 281250, at *3 (Del. Super. Ct. May 21, 1998) (holding that where the contract was signed by USHV on behalf of USHT, USHV has standing to sue only as a third party beneficiary rather than as a party to the contract).  Nonetheless, Delaware courts have held that "employees or directors of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they act within their

role." *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994) (citations omitted); *accord Kuroda*, 971 A.2d at 884 & n.20; *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *9 (Del. Ch. June 14, 2002).  Therefore, if Mr. Hermes undertook the allegedly tortious act—firing Plaintiff for purported cause—in his role as CEO of ClaimDeck, no liability will attach.  Plaintiff fails to make any showing to the contrary.  She does not allege that any action Mr. Hermes took purely in his role as an officer of Hermes Law influenced—let alone caused—ClaimDeck to terminate Plaintiff or deny her the options.  She does not allege that ClaimDeck based its termination decision upon statements he made or actions he took on behalf of Hermes Law.  And Plaintiff's argument that Mr. Hermes "was acting in his role as a Hermes Law officer when he terminated [Plaintiff]," Dkt. No. 40 at 33, does not comport with the contract which authorizes ClaimDeck and its subsidiaries—and not any other person or entity—to terminate Plaintiff for cause, Dkt. No. 36-3 at 2, 10.[27]  Plaintiff does not allege that either Mr. Hermes or Hermes Law is a subsidiary of ClaimDeck such that Mr. Hermes could have deprived Plaintiff of the stock options by terminating her in any role other than as an officer of ClaimDeck.

Plaintiff argues that "even if the Court finds that [Mr.] Hermes was acting . . . as an officer of ClaimDeck, [Plaintiff] alleges numerous facts that support the proposition that he acted out of malice and not as a corporate employee or officer."  Dkt. No. 40 at 33.  For an act to be considered

---

[27] The Option Agreement provides that "[i]n the event the Grantee ceases to be employed by, or provide service to, the Employer on account of a termination by the Employer for Cause, any Option held by the Grantee shall terminate as of the date the Grantee ceases to be employed by, or provide service to, the Employer."  Dkt. No. 36-3 at 10; *see also id.* at 2 ("[I]f the Grantee engages in conduct that constitutes Cause at any time while the Grantee is employed by, or providing service to, the Employer or after the Grantee's employment or service terminates, the Option shall immediately terminate.").  The contract defines the term "Grantee" to refer to Plaintiff and defines the term "Employer" to refer to ClaimDeck and its subsidiaries, as determined by the Board or by a committee consisting of members of the Board.  *Id.* at 1, 6, 11.  Accordingly, only ClaimDeck or its subsidiaries can terminate the Grantee for cause.

outside the scope of the actor's authority, the act "must be committed beyond the authorized boundaries of the person's employment and must not be motivated by that person's employment." *Nye v. Univ. of Del.*, 2003 WL 22176412, at *7 (Del. Super. Ct. Sept. 17, 2003). "Acts that are considered outside the course and scope of one's employment are often those which are carried out for an employee's own personal motives and benefit and not for their employer." *Id.*; *see Kuroda*, 971 A.2d at 885 (dismissing claim for tortious interference where "[t]he complaint states only conclusory allegations that defendants acted for personal reasons and therefore exceeded the scope of their authority").

Plaintiff points to the allegations in the complaint that she received excellent professional feedback and was terminated only a few months after receiving a positive performance review—after she stated her intention to exercise her equity options. Dkt. No. 40 at 33 (citing Dkt. No. 30 ¶¶ 43–67). She argues that "it cannot have been a sound business decision to fire an exemplary employee except for reasons of malice and personal financial gain." *Id.* Those allegations fail to support a plausible inference that Mr. Hermes was motivated to terminate Plaintiff by any personal concern outside of his desire to act on behalf of ClaimDeck. The decision to terminate an employee who has received positive performance evaluations is not inherently illogical from a strategic business standpoint. *See Rubinow v. Boehringer Ingelheim Pharms., Inc.*, 496 F. App'x 117, 119 (2d Cir. 2012) (stating that plaintiff's "favorable performance evaluations" are "entirely consistent with [defendant's] explanation for her termination, which is that she was fired for sporadic inappropriate behavior over the course of a few years"); *Brown v. AstraZeneca Pharms., L.P.*, 2006 WL 2376380, at *10 (E.D.N.Y. Aug. 16, 2006) (holding that plaintiff did not establish that the reasons given for his termination were pretextual when he received positive evaluations but was terminated for poor performance); *see also Yan Ping Xu v. N.Y.C. Dep't of Health and Mental*

*Hygiene*, 2020 WL 8671952, at \*34 (S.D.N.Y. Dec. 22, 2020) (noting that "[w]ere it otherwise, employers would be incentivized not to provide positive feedback to employees that they are trying to help improve"). There is nothing inherently wrongful or self-interested in a corporate agent's decision to terminate an employee to prevent the dilution of the company's equity. Plaintiff has not identified any indicators of malice connected to her termination or identified a specific personal benefit Mr. Hermes received from her termination. *See Kuroda*, 971 A.2d at 885 (conclusory allegations that defendants "interfered with [plaintiff's] contractual relations as part of a campaign of personal retaliation in which they sought both 'to protect [their] personal reputations and interests' and 'to enrich themselves at [plaintiff's] expense'" were insufficient to support a claim for tortious interference with contract.); *Am. Bottling Co. v. Repole*, 2020 WL 7787043, at \*6–7 (Del. Super. Ct. Dec. 30, 2020) (dismissing claim for tortious interference with contract where plaintiff failed to connect the allegedly wrongful conduct to "any bad faith or self-interested motive [defendant] allegedly had" and plaintiff thus could not "overcome the presumption that [defendant] acted for [the company's] benefit"). Plaintiff's claim for tortious interference with contract thus would fail as to Mr. Hermes even if a legally sufficient underlying breach of contract had been pleaded.

Defendants argue that Plaintiff also fails to show Hermes Law is not entitled to the affiliate privilege which they claim would insulate it from liability for tortious interference. Dkt. No. 37 at 36–38. "Delaware's respect for corporate separateness means that Delaware maintains a role for tortious interference even when one entity controls another." *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at \*26 (Del. Ch. Oct. 7, 2019); *accord Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012). Delaware courts have thus rejected the proposition that a corporate parent "cannot be liable for interfering with the performance of a

wholly owned subsidiary." *Shearin*, 652 A.2d at 590.  Instead, Delaware law recognizes "a limited affiliate privilege that protects a parent corporation that 'pursues lawful action in the good faith pursuit of [the subsidiary's] profit making activities.'" *Bandera Master Fund*, 2019 WL 4927053, at *26 (citing *Shearin*, 652 A.2d at 590).  The affiliate privilege applies to "a corporate parent and its subsidiary, or wholly owned affiliates with a common parent, [or] a general partner and its controllers" so long as the affiliated entities or persons "share the commonality of economic interests which underlay the creation of an interference privilege." *Id.* at *27 (citation omitted); *see also Grunstein v. Silva*, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009) (recognizing that "an 'interference privilege' exists where non-parties to the contract share a commonality of economic interests with one of the parties and act in furtherance of their shared legitimate business interests" (citations omitted)); *Shearin*, 652 A.2d at 590 n.14 ("[T]he relationship among wholly owned affiliates with a common parent is no different, insofar as is relevant here, than that between a parent and a subsidiary" because "[s]uch entities share the commonality of economic interests.").

The affiliate privilege does not, however, operate as an absolute bar to liability.  *See In re CVR Ref., LP Unitholder Litig.*, 2020 WL 506680, at *17 (Del. Ch. Jan. 31, 2020); *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *22 (Del. Ch. Sept. 1, 2023).  Instead, to determine whether the defendant induced the breach "without justification," the Delaware Supreme Court has instructed courts to refer to the seven factors set forth in section 767 of the Second Restatement of Torts:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*See WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (citing Restatement (Second) of Torts § 767 (1979)).  The relationship between affiliated parties is thus only one of the factors to be considered and balanced.  *See Bandera Master Fund*, 2019 WL 4927053, at *28 ("Delaware's approach uses the concept of justification to determine whether interference is improper and accounts for related-party status when assessing justification."); *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *28 (Del. Ch. Nov. 17, 2014) ("When a plaintiff contends that a parent entity tortiously interfered with a contract to which its subsidiary was a party, a court applying Delaware law analyzes the seven factors in a manner that takes into account the dynamics of the parent-subsidiary relationship, including the parent's significant economic interest in its subsidiary, the parent's interest in consulting with its subsidiary about the subsidiary's profit-making opportunities, and the legitimate use of subsidiaries for cabining risk.").

Justification is an affirmative defense that a defendant may claim if it is available on the face of the complaint.  *See Gilbane Bldg. Co. v. Nemours Found.*, 606 F. Supp. 995, 1006 n.14 (D. Del. 1985) ("Justification for interference in another's business is an affirmative defense and is no part of the plaintiff's case." (quoting *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 749 (5th Cir. 1973); *In re Joy Glob., Inc.*, 423 B.R. 445, 448 (D. Del. 2010); *Leeward Petroleum, Ltd. v. Mene Grande Oil Co.*, 415 F. Supp. 158, 164 (D. Del. 1976); *In re SemCrude, L.P.*, 504 B.R. 39, 69 (Bankr. D. Del. 2013), *aff'd sub nom. In re SemCrude L.P.*, 864 F.3d 280 (3d Cir. 2017).  As Justice Holmes stated, "[i]t is enough to allege and prove the conduct and effect, leaving the

defendant to justify if he can." *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 259 (1916). But where "[t]he allegations of the complaint, if believed, establish that [the party charged with interference] is an affiliated entity of . . . the party alleged to have breached its contract[,] . . . the burden should fall on the plaintiff to plead and prove that the privilege among affiliates to discuss and recommend action is not applicable or, stated affirmatively, to allege facts that would make the 'interference' improper." *Shearin*, 652 A.2d at 590–91; *see vMedex, Inc. v. TDS Operating, Inc.*, 2020 WL 4925512, at *9 (D. Del. Aug. 21, 2020).

Defendants argue that Hermes Law and ClaimDeck shared a commonality of economic interest because Mr. Hermes "is the sole owner of Hermes Law, is the majority owner of ClaimDeck, is the Chief Executive Officer of both Hermes Law and ClaimDeck, and that Plaintiff was hired by Hermes Law but worked for ClaimDeck after the latter was incorporated." Dkt. No. 37 at 37. However, while Plaintiff alleges in the complaint that she was hired and employed by Hermes Law but performed work for ClaimDeck after it was incorporated, Dkt. No. 30 ¶ 25, she does not allege that Mr. Hermes is the sole owner of Hermes Law, the majority owner of ClaimDeck, or the CEO of Hermes Law.[28] "[T]he parties are limited to the allegations of the complaint for purposes of their motion to dismiss." *Nolan v. City of New York*, 2024 WL 4575374, at *5–6 & n.5 (S.D.N.Y. Oct. 25, 2024). Plaintiff does allege that she and several other Hermes Law employees performed work for ClaimDeck and that both entities are controlled by Mr. Hermes. Dkt. No. 30 ¶¶ 26–27. Taken together, it is not clear from these facts that ClaimDeck and Hermes Law shared a commonality of economic interest. Plaintiff does not allege that one is the parent of, or otherwise controls the other, nor that they are wholly owned subsidiaries of the

---

[28] Although the contract does not allege that Mr. Hermes was CEO of ClaimBridge, the Option Agreement, which the court considers as integral to the complaint, indicates next to Mr. Hermes' signature that his title is "CEO." Dkt. No. 36-3 at 6.

same parent.  *Cf. Grunstein*, 2009 WL 4698541, at *17 (affiliate privilege implicated where the affiliate "owns, controls, or manages" the breaching party).  Nor does Hermes Law have any apparent "economic interest in the contract" at issue.  *vMedex*, 2020 WL 4925512, at *9 (citing *AJZN, Inc. v. Yu*, 2015 WL 331937, at *12 (D. Del. Jan. 26, 2015)).  Because the complaint does not establish that Hermes Law and ClaimBridge are affiliated entities, the affirmative defense is not available, and Defendants thus have not established that the affiliate privilege weighs against a finding that any interference undertaken by Hermes Law was unjustified.

### E.    NYLL

Plaintiff claims that her vested stock options are considered "wages" under the NYLL and that "[b]y depriving Plaintiff of her stock options, Defendants made unlawful deductions and withholdings from Plaintiff's wages" in violation of NYLL § 193.  Dkt. No. 30 ¶¶ 91–94; *see* NYLL § 193 (providing that deductions from earned wages are unlawful unless they fit one of the statute's specifically enumerated exceptions such as deductions for insurance payments, discounted parking, labor organization dues, and "similar payments for the benefit of the employee").  Defendants dispute that the options meet the NYLL's definition of wages.  Dkt. No. 37 at 34–35; Dkt. No. 46 at 19–20.

For the purposes of section 193 of the NYLL, "wages" are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis."  NYLL § 190(1).  This is a narrower definition of wages than the New York legislature has used elsewhere.  *See Truelove v. Ne. Cap. & Advisory, Inc.*, 738 N.E.2d 770, 772 (N.Y. 2000) ("Unlike in other areas where the Legislature chose to define broadly the term 'wages' to include every form of compensation paid to an employee, including bonuses, the Legislature elected not to define that term in Labor Law § 190(1) so expansively as to cover all forms of employee remuneration." (citing NYLL §§ 517, 518)).  The

New York Court of Appeals has accordingly held that this "more restrictive statutory definition of 'wages,' as 'earnings . . . for labor or services rendered,' excludes incentive compensation based on factors falling outside the scope of the employee's actual work." *Id.* (quoting *Tischmann v. ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1370 (S.D.N.Y. 1995)).  Thus, where "[t]he terms of defendant's bonus compensation plan did not predicate bonus payments upon plaintiff's own personal productivity nor give plaintiff a contractual right to bonus payments based upon [plaintiff's] productivity," that factor "take[s] plaintiff's bonus payments out of the statutory definition of wages." *Id.*

Courts have applied this same principle to determine that where payments are made in the form of equity not tied to the employee's personal job performance, such payments are not considered wages for the purposes of NYLL § 193. *See Guiry v. Goldman, Sachs & Co.*, 814 N.Y.S.2d 617, 619 (1st Dep't 2006) (rejecting plaintiff's argument that stock options were wages under the statute because "the ultimate value of such equity-based compensation would depend on [the company's] stock price after the rights vested, at the time of the delivery of the RSU's or the exercise of the option" and "[t]hus, such compensation bears the hallmark of incentive compensation—its value to the recipient depends on the firm's 'overall financial success,' not simply on the employee's 'personal productivity'" (quoting *Truelove*, 738 N.E.2d at 772)); *Vekaria v. Mthree Corp. Consulting, Ltd.*, 2024 WL 4337542, at *8 (S.D.N.Y. Sept. 27, 2024) (dismissing NYLL claims because the equity grant "was unrelated to [plaintiff's] personal job performance or his regular salary, and . . . the ultimate value of the equity, as a stake in [defendant's] business, depended more on the overall financial success of the company than on [plaintiff's] personal success as a salesperson"); *Beach v. HSBC Bank USA, N.A.*, 2017 WL 5633162, at *2–3 (S.D.N.Y. Nov. 20, 2017) (holding that where a grant of restricted stock vests

over time, it is not wages dependent upon the employee's personal productivity because the "value of those shares could have substantially diminished or increased irrespective of [plaintiff's] own performance").

Plaintiff has not shown that the options grant was connected to her personal productivity as opposed to ClaimDeck's overall financial success. She alleges that she was awarded the options "[b]ecause of [her] continued excellent performance," Dkt. No. 30 ¶ 43, but this falls short of alleging that the award hinges on her personal productivity such that it could be considered wages earned for work performed. It instead aligns more closely with the category of "bonuses offered as a means to attract or retain employees [which] generally do not constitute wages, because such incentive payments do not typically depend on the employee's personal productivity." *Vekaria*, 2024 WL 4337542, at *6. The Option Agreement states that the nonqualified stock option grant was being made "as an inducement for the [Plaintiff] to promote the best interests of [ClaimDeck] and its stockholders," and permits Plaintiff to purchase 58,825 shares of ClaimDeck for $1.01 per share. Dkt. No. 36-3 at 1. Plaintiff is not entitled to more or less equity depending upon her productivity and the ultimate value of the options is determined by ClaimDeck's financial success at the time of exercise. *See Lerner v. Credit Suisse Sec. (USA) LLC*, 147 N.Y.S.3d 31, 32 (1st Dep't 2021) ("The subject deferred equity-based compensation did not constitute 'wages' within the meaning of Labor Law § 190(1) because, although it was initially awarded in recognition of each employee's personal performance, its ultimate value was dependent on the future market value of the company stock."); *Adler v. Solar Power, Inc.*, 2018 WL 1626162, at *12 (S.D.N.Y. Mar. 30, 2018) ("The future value of the restricted stock at issue here was dependent on [the company's] performance not that of Plaintiff individually, and, therefore, such stock does not qualify as wages under the NYLL."); *Guiry*, 814 N.Y.S.2d at 619; *Vekaria*, 2024 WL 4337542, at

*8; *Beach*, 2017 WL 5633162, at *2–3.  The allegation that Plaintiff's equity interests had already vested and she had expressed an intent to purchase her options, Dkt. No. 30 ¶¶ 63–64, 66, does not compel a different ruling.  *See Int'l Bus. Machs. Corp. v. Martson*, 37 F. Supp. 2d 613, 617 (S.D.N.Y. 1999) (noting that the plaintiff's equity award had already vested and he had actually exercised the options, but stating that is "a distinction without a difference" and holding that the options did not fit the definition of wages).

Because Plaintiff's stock options are not wages under NYLL § 191(1), the deprivation of those stock options cannot give rise to a claim for unpaid wages under NYLL § 193.  "Dismissal with prejudice is appropriate when the flaws in [the] pleading are incurable."  *Green Star Energy Sols., LLC v. Edison Props., LLC*, 2022 WL 16540835, at *17 (S.D.N.Y. Oct. 28, 2022) (citing *Kling v. World Health Org.*, 532 F. Supp. 3d 141, 154 (S.D.N.Y. 2021)).  Plaintiff's NYLL claim is therefore dismissed with prejudice.

## CONCLUSION

Defendants' motion to stay this case and compel arbitration is DENIED.

Defendants' motion to transfer this case to the Northern District of Texas is DENIED.

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Defendants' motion to dismiss is GRANTED without prejudice with respect to all of Plaintiff's claims against Ms. Hermes.  Defendants' motion to dismiss is DENIED as to her claims for sexual harassment under the NYCHRL and NYSHRL (Counts I and II) and conversion (Count VI). Defendants' motion to dismiss is GRANTED without prejudice with respect to Plaintiff's claims for breach of contract (Count III) and tortious interference with contract (Count V).  Defendants' motion to dismiss is GRANTED with prejudice with respect to Plaintiff's claim for violation of NYLL § 193 (Count IV).

Plaintiff may file an amended complaint no later than December 12, 2024.

The discovery stay is lifted.

The Clerk of Court is respectfully directed to close Dkt. No. 34.


SO ORDERED.


Dated: November 21, 2024
       New York, New York

_____
LEWIS J. LIMAN
United States District Judge